UNITED STATES of America,
Plaintiff and Appellee,

v.

STATE OF CALIFORNIA, STATE WATER RESOURCES CONTROL BOARD, et al., Defendants and Appellants.

Nos. 81-4189X, 81-4309X.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 12, 1981.

Decided Dec. 20, 1982.

Martin Green, Washington, D.C., for United States.

Roderick E. Walston, Deputy Atty. Gen., San Francisco, Cal., for State of Cal.

Before KENNEDY, PREGERSON and REINHARDT, Circuit Judges.

KENNEDY, Circuit Judge:

This case involves a continuing dispute between the state and federal governments over authority to determine the scope of operations of New Melones Dam, on the Stanislaus River in California. The New Melones project was originally authorized by section 10 of the Flood Control Act of 1944, 58 Stat. 887, 901. In 1962 Congress appropriated funds to make the dam a large, multi-purpose project by enacting section 203 of the Flood Control Act of 1962, Pub.L. 87–874, 76 Stat. 1173. The 1962 statute governs for our purposes.[1]

1. The relevant provisions of the Flood Control Act of 1962 state:

The project, as envisioned, would ultimately store 2.4 million acre-feet a year of water for power generation, irrigation, public recreation, and flood control.

The U.S. Bureau of Reclamation applied to the California State Water Resources Control Board ("California Water Board") for appropriation of the 2.4 million acre-feet of water, as contemplated by the 1962 statute. In a thirty-seven page decision ("Decision 1422"), the California Water Board approved the applications for water subject to twenty-five conditions and limitations. The full text of Decision 1422 is reprinted as an appendix to the district court's opinion, 509 F.Supp. at 888–902; the twenty-five conditions are set out in full in an appendix to this opinion. The validity of these specific conditions is at the heart of this case. The substance of the important conditions can be briefly described. No water was authorized for the project during the months of July, August, September, and October, because studies showed that no water was available in those months. No water in any season would be appropriated for irrigation until the California Water Board determined the need for the water. No water would be appropriated *solely* for power generation, although water already

The New Melones project, Stanislaus River, California, authorized by the Flood Control Act approved December 22, 1944 (58 Stat. 887), is hereby modified substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 453, Eighty-seventh Congress, at an estimated cost of $113,717,000:

[1] *Provided,* That upon completion of construction of the dam and powerplant by the Corps of Engineers, the project shall become an integral part of the Central Valley project and be operated and maintained by the Secretary of the Interior pursuant to the Federal reclamation laws, except that the flood control operation of the project shall be in accordance with the rules and regulations prescribed by the Secretary of the Army:

[2] *Provided further,* That the Stanislaus River Channel, from Goodwin Dam to the San Joaquin River, shall be maintained by the Secretary of the Army to a capacity of at least eight thousand cubic feet per second subject to the condition that responsible local interests agree to maintain private levees and to prevent encroachment on the existing channel and floodway between the levees:

[3] *Provided further,* That before initiating any diversions of water from the Stanislaus River Basin in connection with the operation of the Central Valley project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversions shall at all times be subordinate to the quantities so determined:

[4] *Provided further,* That the Secretary of the Army adopt appropriate measures to insure the preservation and propagation of fish and wildlife in the New Melones project and shall allocate to the preservation and propagation of fish and wildlife, as provided in the Act of August 14, 1946 (60 Stat. 1080), an appropriate share of the cost of constructing the Stanislaus River diversion and of operating and maintaining the same:

[5] *Provided further,* That the Secretary of the Army, in connection with the New Melones project, construct basic public recreation facilities, acquire land necessary for that purpose, the cost of constructing such facilities and acquiring such lands to be non-reimbursable and nonreturnable:

[6] *Provided further,* That contracts for the sale and delivery of the additional electric energy available from the Central Valley project power system as a result of the construction of the plants herein authorized and their integration with that system shall be made in accordance with preferences expressed in the Federal reclamation laws except that a first preference, to the extent as needed and as fixed by the Secretary of the Interior, but not to exceed 25 per centum of such additional energy, shall be given, under reclamation law, to preference customers in Tuolumne and Calaveras Counties, California, for use in that county, who are ready, able, and willing, within twelve months after notice of availability by the Secretary of the Interior, to enter into contracts for the energy and that Tuolumne and Calaveras County preference customers may exercise their option in the same date in each successive fifth year providing written notice of their intention to use the energy is given to the Secretary not less than eighteen months prior to said dates:

[7] *And provided further,* That the Secretary of the Army give consideration during the preconstruction planning for the New Melones project to the advisability of including storage for the regulation of streamflow for the purpose of downstream water quality control.

76 Stat. at 1191–92. For the purposes of this opinion, this section of Pub.L. 87–874 will be referred to as the appropriating statute or the 1962 statute.

present in the dam for other purposes could be used to generate power. Additional conditions required that the project observe California's water quality goals, and abide by California's county of origin preference.

Having been denied its full requested appropriation of water, the United States sought a judicial declaration that California could not place any conditions on a federal project, once it had been determined that sufficient unappropriated water was available for operations the federal government chose to conduct. The district court agreed and entered a declaratory judgment to that effect. *United States v. State of California,* 403 F.Supp. 874 (E.D.Cal.1975). This court affirmed, 558 F.2d 1347 (9th Cir.1977), with modifications not relevant here. The Supreme Court granted certiorari and reversed. *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). The Court held that, under section 8 of the Reclamation Act of 1902, 32 Stat. 390, codified at 43 U.S.C. § 383 (1976), any conditions imposed by California were valid as long as "the condition actually imposed" was not "inconsistent with congressional directives as to the New Melones Dam." *Id.* at 679, 98 S.Ct. at 3003.

On remand, the district court found that most conditions were consistent with all relevant "congressional directives," but that the prohibition of appropriation of water for power generation was void as contrary to congressional intent. *United States v. California,* 509 F.Supp. 867 (E.D.Cal.1981).[2] Both sides appeal, and the validity of the nineteen contested "conditions" is squarely presented to this court.[3]

Earlier in this litigation, the Supreme Court noted that resolution of the question whether California's conditions are consistent with congressional intent might require additional factfinding. 438 U.S. at 679, 98 S.Ct. at 3003. The United States, however, refused to accept this suggestion, and therefore presented on remand to the district court no evidence of impracticality or harmful consequences from any specific condition set by the California Water Board. The United States takes a hard-line position by asserting that since it built the dam it need not justify its operational plans so long as those plans are consistent with the scope of the project as envisioned by Congress. We reject this broad contention, as the Supreme Court has done in this very litigation. While Congress, if it wished, could have eliminated the role of state law in governing the project, the question before us is whether, as a matter of statutory interpretation, Congress has in fact done so. We find nothing in California's conditions that cannot be in harmony with the letter and spirit of the 1962 statute given the failure of the United States to introduce evidence to show the existence of facts that might dictate a contrary result. We are satisfied that the United States is not entitled at this time and on this record to invalidate any of the conditions placed by the California Water Board on the New Melones project. The judgment of the court below is affirmed insofar as it upheld the conditions, and reversed insofar as it invalidated them.

## I.

██ All parties tender the premise that Congress has plenary constitutional power to override any state regulation of the

---

**2.** The court below apparently agreed with the United States that the proper inquiry was into the consistency of the conditions imposed by the California Water Board with "Congressional intent as that term is traditionally used." 509 F.Supp. at 880. Under this approach, the trial judge found the limits on seasonal appropriation and irrigation appropriation, the county of origin conditions, and the water quality conditions to be valid. The limitations on appropriation of water for power generation, however, were found invalid "to the extent

they purport to limit the amount of unappropriated water which the federal agencies may impound for power generation purposes." *Id.* at 888. The district court's reasoning on various conditions will be discussed at greater length, where relevant, *infra.*

**3.** Conditions 12, 15, 16, 19, 23, and 24 are not challenged by the United States; therefore their validity is assumed for the purposes of this litigation.

project under the spending,[4] the property,[5] or the commerce powers.[6] The case as presented, therefore, can be resolved as a matter of statutory interpretation without reaching ultimate questions of constitutional power.[7] *See generally* 2 R. Clark, Waters and Water Rights 125–29 (1967); Walston, *Reborn Federalism in Western Water Law: The New Melones Dam Decision,* 30 Hastings L.J. 1645 (1979); Note, *Federal Water Projects: After* California v. United States, *What Rights Do the State and Federal Governments Have in the Water?,* 11 U.C. Davis L.Rev. 401 (1978).

A threshold question for our consideration is the application of the Supreme Court's standard that all conditions imposed by California are invalid if inconsistent with congressional directives. The United States argues in essence that the issue is whether California's conditions are preempted by the 1962 appropriating statute. Support for this preemption analysis derives from some passages in the Supreme Court's opinion.[8]

California, on the other hand, argues, as do *amici,*[9] that when the Supreme Court used terms like "clear," "explicit," or "specific" congressional directives,[10] the Court was requiring that a state condition be upheld unless clearly contradicted by the language of the congressional enabling statute, in this case Pub.L. 87–874.

California relies on section 8 of the 1902 Reclamation Act, which states in part:

Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, . . .

32 Stat. 390, codified at 43 U.S.C. § 383 (1976). This section was construed by the Supreme Court in the earlier stage of this litigation:

From the legislative history of the Reclamation Act of 1902, it is clear that state law was expected to control in two important respects. First, and of controlling importance to this case, the Secretary would have to appropriate, purchase, or condemn necessary water rights in strict conformity with state law. . . .

Second, once the waters were released from the Dam, their distribution to individual landowners would again be controlled by state law.

438 U.S. at 665, 667, 98 S.Ct. at 2996–2997. California asserts that the historical policy of deference to state law is so strong that a congressional intent to preempt state law must be expressed explicitly or state law will govern.

**4.** *See United States v. Butler,* 297 U.S. 1, 65–66, 56 S.Ct. 312, 319, 80 L.Ed. 477 (1936); *Buckley v. Valeo,* 424 U.S. 1, 90–91, 96 S.Ct. 612, 668–669, 46 L.Ed.2d 659 (1976); *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 738–40, 70 S.Ct. 955, 962–963, 94 L.Ed. 1231 (1950).

**5.** *See Kleppe v. New Mexico,* 426 U.S. 529, 535–41, 96 S.Ct. 2285, 2289–2292, 49 L.Ed.2d 34 (1976).

**6.** *See Wickard v. Filburn,* 317 U.S. 111, 118–29, 63 S.Ct. 82, 85–91, 87 L.Ed. 122 (1942).

**7.** The tenth amendment serves as an affirmative external limitation on federal legislation otherwise within the commerce power. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). We do not, however, intimate any view on the appropriate application of *Usery* to this context, should the question arise.

**8.** At one point, the Court speaks of state law being overridden "when it [is] inconsistent with congressional objectives," 438 U.S. at 672, 98 S.Ct. at 2999; at another, it refers to "congressional intent" from a subsequent statute invalidating state law restrictions on a water project. *Id.* at 669 n. 21, 98 S.Ct. at 2998 n. 21.

**9.** Amicus briefs supporting the position of California were filed by Environmental Defense Fund, jointly with Friends of the River, and by a coalition of thirteen Western states.

**10.** The Supreme Court in its opinion in this case spoke of "specific," 438 U.S. at 672 n. 25, 98 S.Ct. at 2999 n. 25, "clear," *id.* at 672, 98 S.Ct. at 2999, and "explicit" congressional directives, *id.* at 673, 98 S.Ct. at 3000, overriding state law.

California argues that only explicit federal statutory policies, such as those the Court found decisive in *Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) (160 acre limitation), and *City of Fresno v. California,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963) (preference for irrigation use over municipal use), are sufficient to preempt the operation of inconsistent state law. The issue here, according to California, is the extent to which California's conditions can be inconsistent with the Flood Control Act of 1962 before those conditions must be invalidated.

■ We agree with the district court that California's broad contentions must be rejected. We do not think that section 8 of the 1902 Reclamation Act was intended to require any later Congress to tolerate state laws whose operation would otherwise be curtailed by the Supremacy Clause,[11] nor to require any particular form of clear statement by a later Congress before inconsistent state laws were overridden. *See* Sax, *Problems of Federalism in Reclamation Law,* 37 U.Colo.L.Rev. 49, 66–68 (1964). Section 8 requires only that state law will apply unless the contrary is intended by Congress; as we stated in *United States v. Tulare Lake Canal Co.,* 677 F.2d 713, 717 (9th Cir.1982), the Supreme Court decision in *California v. United States* requires "that the United States follow state water law absent a pre-empting federal statute." The question before us, therefore, is whether state law, otherwise applicable by virtue of section 8, is displaced by subsequent congressional action. The analysis undertaken by the district court, consistent with settled preemption principles, was therefore appropriate.

■ We are mindful, in deciding whether later federal law overrides inconsistent state law, that we may not seek out conflicts between state and federal regulation where none clearly exists. *Joseph E. Sea-*

*gram & Sons v. Hostetter,* 384 U.S. 35, 45, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336 (1966). The Supreme Court noted in *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), that "when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* at 157, 98 S.Ct. at 994, quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). This admonition is particularly applicable in the reclamation context. In this very litigation, the Supreme Court has detailed the long history of "purposeful and continued deference to state water law by Congress." 438 U.S. at 648–70, 653, 98 S.Ct. at 2987–2998, 2990. "If the term 'cooperative federalism' had been in vogue in 1902, the Reclamation Act of that year would surely have qualified as a leading example of it." *Id.* at 650, 98 S.Ct. at 2988.

It is noteworthy that the first proviso of the statute appropriating funds for the New Melones Dam, the same statute the United States wishes to use as a basis for arguing that state law is superseded, incorporates the Reclamation Act of 1902, including section 8 thereof:

upon completion of construction of the dam and powerplant by the Corps of Engineers, the project shall ... be operated and maintained by the Secretary of the Interior pursuant to the Federal reclamation laws....

76 Stat. at 1191.

■ Cases deciding whether state regulation is preempted under the Supremacy Clause by congressional action aid us in interpreting the Supreme Court's command that only state law "inconsistent" with "congressional directives" is overridden by the relevant portion of 87–874. A state

11. Article VI, cl. 2 states:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding.

statute or regulation is preempted by a federal rule "to the extent it conflicts with a federal statute," *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), or where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971), quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *see also Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981).

■ In the case before us, therefore, a state limitation or condition on the federal management or control of a federally financed water project is valid unless it clashes with express or clearly implied congressional intent or works at cross-purposes with an important federal interest served by the congressional scheme. Similar formulations were found appropriate by the Supreme Court of California in *Environmental Defense Fund, Inc. v. East Bay Municipal Utility District,* 20 Cal.3d 327, 338, 572 P.2d 1128, 1134, 142 Cal.Rptr. 904, 910 (1978), and by Professor Sax in his article, *Problems of Federalism in Reclamation Law,* 37 U.Colo.L.Rev. 49, 68 (1964).

With this test in mind, we will address the question whether the specific conditions imposed by California are inconsistent with congressional directives as to the New Melones Dam.

## II.

California, in Decision 1422, provided that no appropriation of water to the New Melones project for "consumptive uses" (largely, irrigation) would be allowed immediately. Condition 1 states in part:

> Until further notice of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes.[12]

Condition 2 includes this statement of when water will be appropriated for irrigation:

> Further order of the Board shall be preceded by a showing that the benefits that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife and recreation in the watershed above New Melones Dam and that the permittee has firm commitments to deliver water for such other purposes.

This language is capable of broad construction, so that California might never allow the full use of the dam contemplated by Congress. Such a reading would raise serious questions of inconsistency with the federal statute, and the conflict might be of constitutional dimension. This is not our case, however, for California has interpreted the clause narrowly. California concedes in this litigation that the California Water Board cannot "*permanently* prevent full impoundment of water in the New Melones Project, since this result would be directly inconsistent with the congressional mandate that the project shall eventually achieve full storage capacity." Cal. Opening Brief at 19 n. 8. Congress has already weighed the benefits and costs; all that is needed is for the United States to "develop a plan for consumptive uses." *Id.* at 6. The district court held that "[i]n the consumptive use segment of the decision, the Board, in effect, said to the Bureau, 'Show us your contracts and your ability to deliver the water and it may be available to you.'" 509 F.Supp. at 886; *see also id.* at 884. California has not disputed this interpretation on appeal.

■ Thus interpreted, the provision is easily reconciled with congressional intent. A basic provision of California water law requires that water be appropriated only for beneficial use. Cal. Const. Art. XIV, § 3. Far from being inconsistent, applicable federal law mandates that the "benefi-

12. We note that the United States raises no issue concerning the purposes of preservation and enhancement of fish and wildlife and recreation, which Decision 1422 requires the New Melones project to serve. The fourth and fifth provisos of the 1962 statute require that the project serve these purposes.

cial use" standard be met by uses of water in federal reclamation projects.

> [T]he right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.

Section 8 of the Reclamation Act of 1902, 32 Stat. 390, codified at 43 U.S.C. § 372 (1976). *See also Rivers and Harbors—Flood Control, 1962: Hearings Before a Subcomm. of the Sen. Comm. on Public Works,* 87th Cong., 2d Sess. 832–35 (1962) (recognition of beneficial use principle). If the principle of beneficial use governs, this condition on irrigation and other consumptive uses must be upheld. Unappropriated, the water provides some benefit to California residents as it runs down the wild Stanislaus River, providing scenic beauty, stream fishing, and other recreational opportunities. Cal. Water Code § 1243 (West). California may require that, before these opportunities are lost, the United States show that it has customers who need the water for irrigation.

The United States does not appear to dispute these principles, but asserts that Congress has already determined the issue of beneficial use. *Friends of the Earth v. Armstrong,* 485 F.2d 1 (10th Cir.1973), *cert. denied,* 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974), is cited for the proposition that failing to fill a federally funded project to capacity is inherently inconsistent with congressional intent. *Friends of the Earth* is distinguishable because in that case evidence of congressional intent to fill the interstate project, despite partial resultant inundation of the Rainbow Bridge National Monument, was quite clear. *See* 485 F.2d at 6–8.

Of more importance, *Friends of the Earth* held that the dam need not be permanently operated at less than capacity. Here, we are presented with a more difficult case of deferral of the project's full uses. The United States argues that the power to defer is the power to prevent. We reject that argument here. The United States has

made no attempt to demonstrate that water made available for consumptive purposes will be put to beneficial use or to argue that such a demonstration is impossible, or even difficult. Such a refusal to accept a reasonable requirement of state law serves as a poor foundation for arguing that cooperation would be futile.

There is a preference, in interstate water cases, for "negotiation," "mutual accommodation and agreement," rather than litigation. *See Colorado v. Kansas,* 320 U.S. 383, 392, 64 S.Ct. 176, 180, 88 L.Ed. 116 (1943); *Nebraska v. Wyoming,* 325 U.S. 589, 616–17, 65 S.Ct. 1332, 1349–1350, 89 L.Ed. 1815 (1945). A similar preference applies in cases where we are asked to arbitrate complicated and delicate questions of federalism.

In legal terms, these principles require the United States, at a minimum, to attempt to reconcile its interests with California law before a court can override the state's position as conflicting with federal policy. The precepts of federalism, if followed, should produce mutual respect and accommodation for state interests. The congressional scheme and the Supreme Court's earlier decision in this case make it clear that such precepts are to be carefully observed here. The United States may not justify its demands simply as a raw exercise of superior authority. It may not be indifferent to state interests affected by the operation of an intrastate reclamation project. When the United States sought water to fill the New Melones Dam, in view of the attendant controversy and the existence of alternative beneficial uses for the water, it was incumbent on the United States to respond to California's request for a full showing of the benefits which were to be expected from operation of the dam at full capacity. If a decision predicated on an evaluation of state interests did not properly implement congressional intent, or if it clashed with significant federal policies, the courts would have a record to judge the question.[13] Instead, the United States has

---

**13.** We note a similarity to the National Environmental Policy Act of 1969, codified at 42

refused to show that there is any need for the water for irrigation. In these circumstances, we will not impute extreme positions to a state in an attempt to decide what is in essence a premature question. The condition refusing immediate appropriation of water by the United States for consumptive use has not been shown invalid.

### III.

Condition 2 provides that the California Water Board will appropriate no water for power generation. This is the provision which has excited the attention of *amici*, and which the court below considered to be most difficult.

The effect of Condition 2 is not as drastic as its language might suggest. The Board only decided that in view of the high value it placed on white water rafting, stream fishing, and wildlife preservation—all of which are harmed by higher water levels— "the project's power benefit alone [does not justify] storage in addition to that presently needed for other purposes." Decision 1422 at 21. The Board's decision does not mean that water which is already appropriated for consumptive or other purposes may not be used for power generation.

█ The United States has given us no reason to believe that irrigation use or other consumptive uses for the water would not fill the project to capacity, or that additional impoundment for power is needed after water sufficient for all consumptive uses is impounded. This is not a case in which the government has demonstrated a need to impound water for power purposes only. It follows that we have no basis for holding that the full use of the project for power purposes will not be made in due course, or that interim deferment of full impoundment will adversely affect project feasibility. We note that in *Environmental Defense Fund v. Armstrong*, 487 F.2d 814 (9th Cir.1973), *cert. denied*, 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974), *rehearing denied*, 419 U.S. 1041, 95 S.Ct. 530, 42 L.Ed.2d 319 (1974), the United States advised the Supreme Court as follows:

> [E]ven if the State Board's decision [1422] is found to be binding on the federal agencies, its only effect would be to defer slightly the beneficial use of the full conservation yield of the project. Most of the project purposes were permitted by the Board's decision. The decision does not render the project useless or fundamentally alter its value.

Def. Exh. 7 at 9.

The United States was arguing in the *Armstrong* litigation that a supplemental environmental impact statement did not have to be filed because the impact of Decision 1422 was relatively slight. While we need not go so far as to hold the United States is estopped from asserting a different position here, *see generally* 1B Moore's Federal Practice ¶ 0.405[8], this statement does support our decision. Accordingly, we uphold California's restrictions on appropriation of water for power generation. Condition 3, which does no more than implement Condition 2, is therefore valid as well.

The district court reached a different result. 509 F.Supp. at 885–87. The court found that Congress intended that water be used immediately for power purposes. The Flood Control Act of 1962, in its sixth provi-

U.S.C. §§ 4321–47 (1976). As we recently said in *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir.1982), speaking of section 4332 of NEPA and the comparable provision of the National Historic Preservation Act, 16 U.S.C. § 470f (1976), "[b]oth Acts ... have the goal of generating information about the impact of federal actions on the environment; and both require that the relevant federal agency carefully consider the information produced. [Footnote omitted.] That is, both are designed to insure that the agency 'stop, look, and listen' before moving ahead." The minimal obligation of the United States under the Reclamation Act of 1902, as we interpret it, is to give the State of California information so that it may consider the federal goals of the project in its decisions under state law.

Unlike NEPA, the Supremacy Clause may require invalidation of the result of state decisionmaking even after all relevant federal input has been made. This question will not even be reached until the federal government has made a full attempt to comply with the forms of state law.

so, mentions the anticipated use of the project for power generation. At the time the 1962 changes in the New Melones project were being considered, California did approve the project, including its power potential, without expressing concern for the loss of a stretch of white water. We do not agree with the district court that these facts demonstrate a congressional intent to require the dam to be used immediately for power generation purposes. The issue before Congress was whether a project that would produce power as one of several purposes should be funded, not whether power was such a favored purpose that only the availability of water would limit power generation in the face of a state policy favoring the balancing of water needs. We find nothing in the language or legislative history of the 1962 statute that convinces us of the existence of the latter intent. In 1962 power generation was probably regarded as an incidental benefit of water projects. *See* River and Harbor Act of 1937, 50 Stat. 844, 850; River and Harbor Act of 1962, § 202, 76 Stat. 1173, 1180; *Burley Irrigation Dist. v. Ickes,* 116 F.2d 529, 530–31 (D.C.Cir.1940), *cert. denied,* 312 U.S. 687, 61 S.Ct. 614, 85 L.Ed. 1124 (1941); *see also* 84 Cong.Rec. 10220, 76th Cong., 1st Sess. (1939) (remarks of Reps. White and Martin on Reclamation Project Act of 1939).

We are, of course, aware that with the energy needs of recent years, power generation is a national resource of ever increasing value. Yet, the United States, given an opportunity to "let the Board once again review the power component of the New Melones Project" in light of intervening developments concerning the need for pow-

er, has flatly refused to do so. *United States v. California,* 509 F.Supp. at 887.[14] On this record, we are unable to invalidate the restrictions on appropriation of water for purposes of power generation.

## IV.

The California Water Board required, in Decision 1422, that the New Melones project serve California's water-quality goals.[15] Conditions 5, 7, 8, and 21, as well as 6 and 20,[16] implement this requirement. Conditions 4 and 25 require the New Melones project to abide by the county of origin preference of California water law. California law withholds authority to use water "outside of the county of origin which is necessary for the development of the county." Cal. Water Code § 10505.5 (West); *see also* Cal. Water Code § 10505 (West). There is some indication that Congress was aware that this requirement would apply to its projects. *See Rivers and Harbors—Flood Control, 1962: Hearings on H.R. 13273 Before the Subcomm. on Rivers and Harbors and the Subcomm. on Flood Control of the House Comm. on Public Works,* 87th Cong., 2d Sess. 351 (1962). We find the water quality and county of origin preference conditions analytically similar.

Both conditions demand substantive results which could have been imposed by the decision of federal agencies involved. The seventh proviso of the 1962 statute requires, as to water quality,

[t]hat the Secretary of the Army give consideration during the preconstruction planning for the New Melones project to the advisability of including storage for

**14.** The court below also found that "[t]he Board has ample authority under the power allotted to it by the legislature to reconsider, *sua sponte,* any appropriation permit." *United States v. California,* 509 F.Supp. at 887. While failure to exercise such power may be regrettable, it is perhaps understandable in view of the inflexible position shown by the United States.

**15.** Division 7 of the California Water Code §§ 13000 *et seq.* contains the state's water quality regulations. Particularly important are Chapter 5.5, §§ 13370 *et seq.,* conforming California's regulatory scheme to the Federal

Water Pollution Control Act as amended, codified at 33 U.S.C. § 1251 *et seq.* (West 1978), and §§ 13140–247, which require the preparation of water quality control plans by state and local agencies. It is the goals of these water quality control plans which the Board has required the New Melones project to serve under Decision 1422.

**16.** Conditions 6 and 20 reserve the Water Board's jurisdiction to order changes to serve California's water quality goals, and hence are considered in part V of this opinion.

the regulation of streamflow for the purpose of downstream water quality control.

As to preference for the area where the water originates, the third proviso is more directory:

before initiating any diversions of water from the Stanislaus River Basin in connection with the operation of the Central Valley project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversion shall at all times be subordinate to the quantities so determined.

Thus, both types of conditions, far from working against congressional purposes, lead to results anticipated, and apparently encouraged, by Congress. The United States does not argue that the "basin" given a preference by the appropriating statute differs from the counties identified in Decision 1422 as entitled to a preference under state law.

The United States argues that, nonetheless, the conditions are invalid since Congress meant to have the decisions made by federal agencies, rather than by state government. In its broad form, the argument would render invalid all conditions imposed by the California Water Board, since in the absence of Board action decisions on matters covered by state-imposed conditions would have been made by federal agencies. This would ignore the federalism concerns, visible in the Supreme Court's 1978 decision. It is true that a state cannot require an action solely because a federal agency, on its own initiative, could have decided to do it. But we are not convinced, in the face of section 8 of the Reclamation Act, that Congress's mere direction to federal agencies to operate the New Melones project is a directive which permits federal agencies to ignore state law in the impoundment and distribution of water. The United States has not shown (or argued) that implementation of these conditions would frustrate the attainment of any federal goal. The conditions therefore must be upheld.

V.

The conditions already addressed are those which the parties apparently consider most important, and on which most of their energy has been spent. There remain numerous conditions for our consideration, placed in issue by the posture of this case. We do not find that any of them have been shown to be invalid. The issue of validity, in the case of most of the conditions, is premature. It may be that constitutional standards of ripeness are met. Nonetheless, the parties' actions, as they seek appropriate accommodation of state and federal interests in the operation of the project, will decisively influence the meaning, and hence the consistency with the 1962 statute, of the conditions. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–56, 87 S.Ct. 1507, 1515–1519, 18 L.Ed.2d 681 (1967); *Pence v. Andrus,* 586 F.2d 733, 737–38 (9th Cir.1978).

Conditions 1 and 14 establish that no appropriation for water will be made in the dry summer months. These conditions are based upon the California Water Board's findings that no water is then available. These findings are within the expertise of the Board and are not challenged by the United States. The challenge to the seasonality conditions is not that water already appropriated for other purposes under state law should be appropriated for New Melones, but that "the blanket, mechanical prohibition against the impounding of such unappropriated water as may turn out to be available during the four summer months" is an invalid burden on federal interests. U.S. Opening Brief at 36. While we cannot discern any state interest in refusing to allow water available in the summers of wet years to be used by the project, there would be ample opportunity for resolution of that issue should it arise. The issue is premature at this time.

Conditions 10, 17, and 18 concern the construction of the expanded project. Since the project is now completed, the conditions are moot. Condition 11 purports to require "complete application of water to

the uses authorized" by December 1990. Any effect of this condition is too remote for us to identify. We are not advised by any party of any continuing interest in these conditions. We therefore decline to render an opinion respecting them.

Conditions 6 and 20 reserve power to change the allocation of water for water quality adjustment should circumstances warrant. Conditions 9 and 13 are general reservations by the Board of continuing authority over the project. Condition 22 requires the United States to submit "substantial" changes in the project to California for approval.

California may have a legitimate interest in many aspects of the project's operation. On the other hand, these five conditions could be exercised inconsistently with congressional intent. The New Melones project is intended to be operated by federal officials in pursuance of certain declared goals. California cannot impose burdensome conditions which were not contemplated by Congress, or which work against the achievement of the project's goals. For example, once the federal government has made binding contracts for delivery of water, California would be more restricted than it was when it originally regulated impoundment and distribution of water. We note that the Supreme Court, when it described the two significant ways in which state law would control the federally funded dam, did not mention state control over the actual operation of the dam as one of the purposes intended by Congress. 438 U.S. at 665–67, 98 S.Ct. at 2996–2997. State law, where not inconsistent with federal law, was to control only the impoundment of water into the dam and the distribution of water from the dam to individual landowners. We doubt that California was intended to play a significant role in influencing the later operation of the dam.

Since we are unable to foresee what action California will take under these "reserved power" conditions, we decline to express any views on the validity of such hypothetical action. A spirit of cooperative federalism on both sides may accommodate the inevitable tensions and conflicts incident upon federal operation of an intrastate project, so that the legal question is never presented for adjudication.

## CONCLUSION

None of the conditions imposed by the Water Resources Control Board have been shown to be invalid. The district court is therefore affirmed in part and reversed in part. The case is remanded. The injunction previously issued by the court may be modified or amended by the district court as it deems necessary and appropriate in view of this opinion and the present circumstances of the dam and its storage facility.

## APPENDIX

1–a. The water appropriated under the permit issued pursuant to Application 14858 shall be limited to the quantity which can be beneficially used and shall not exceed 980,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year. Until further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes.

1–b. The water appropriated under the permit issued pursuant to Application 14859 shall be limited to the quantity which can be beneficially used and shall not exceed 6,000 cubic feet per second by direct diversion to be diverted from January 1 to December 31 of each year and 980,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year to be used for power purposes.

1–c. The water appropriated under the permit issued pursuant to Application 19303 shall be limited to the quantity which can be beneficially used and shall not exceed 1,420,000 acre-feet per annum to be collected from November 1 of each year to June 30 of the succeeding year to be used for power purposes.

1–d. The water appropriated under the permit issued pursuant to Application 19304 shall be limited to the quantity which can be beneficially used and shall not exceed 1,420,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year. Until further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes.

2. Until further order of the Board, permittee shall impound in New Melones Reservoir only such water as is necessary to provide (a) not in excess of 98,000 acre-feet per annum for the preservation and enhancement of fish and wildlife to be released at a rate specified by the California Department of Fish and Game, plus (b) such additional water as is necessary to maintain the water quality conditions set forth in paragraph 5. The above amounts are in addition to water stored for satisfaction of prior rights at existing Melones Reservoir and for flood control. No additional impoundment shall be allowed for power and recreational purposes. Further order of the Board shall be preceded by a showing that the benefits that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife and recreation in the watershed above New Melones Dam and that the permittee has firm commitments to deliver water for such other purposes. The Board reserves jurisdiction for the purpose of establishing dry year criteria at the time such impoundment is approved.

3. Before any water is impounded in New Melones Reservoir, permittee shall file with the Board a reservoir operation study showing the water level elevations required to provide the yield specified in paragraph 2. The study shall include details of the permittee's proposed reservoir clearing plan to show the manner in which clearing will progress as additional storage is authorized. A reservoir operation schedule shall be submitted by the permittee which shall be subject to approval of the Board. The study shall be updated at least once every five years until further order of the Board.

4. Permits issued pursuant to Applications 14858 and 19304 shall authorize the use of water for consumptive purposes only in the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin. A petition to amend the permits to include other specific areas will be considered by the Board upon a showing that water from other CVP sources is not available to serve such areas. Any use of water for consumptive purposes outside the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin that may be authorized later shall be subordinate to beneficial use within said counties and shall terminate when contracts are executed and the water is needed for beneficial use within said counties.

5. Releases of conserved water from New Melones Reservoir for water quality control purposes shall be scheduled so as to maintain a mean monthly total dissolved solids concentration in the San Joaquin River at Vernalis of 500 parts per million or less and a dissolved oxygen concentration in the Stanislaus River as specified in the Water Quality Control Plan (Interim), San Joaquin River Basin 5C, State Water Resources Control Board, June 1971.

In the event that the Water Quality Control Plan (Interim) is amended or superseded, the foregoing water quality objectives shall be modified to conform to then current criteria.

6. The State Water Resources Control Board reserves jurisdiction over these permits for the purpose of revising water release requirements for water quality objectives and fish releases and for establishing dry year criteria pursuant to studies to be conducted by the permittee and other parties in an effort to better define water needs.

7. Permittee shall file with the Board at least biennially a report of water diversions and use along the Stanislaus River and San Joaquin River between New Melones Dam and the Vernalis gage which will show any increased diversions subsequent to the beginning of releases of water under this per-

mit, which diversions may be encroaching on the water supply provided for preservation and enhancement of fish and wildlife and for water quality control, and will show what steps, if any, permittee is taking to prevent any such encroachment.

8. Permittee shall file with the Board an annual report showing (a) daily storage level in New Melones Reservoir, (b) daily record of total dissolved solids at Vernalis, and (c) daily record of minimum dissolved oxygen level for the day at Ripon or at an alternate location approved by the Board.

9. The maximum quantities stated herein may be reduced in the license if investigation warrants.

10. Construction work shall be completed on or before December 1, 1980.

11. Complete application of water to the uses authorized by the permit shall be made on or before December 1, 1990.

12. Progress reports shall be submitted promptly by permittee when requested by the State Water Resources Control Board until license is issued.

13. All rights and privileges under this permit, including method of diversion, method of use, and quantity of water diverted, are subject to the continuing authority of the State Water Resources Control Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of said water.

This continuing authority of the Board may be exercised by imposing specific requirements over and above those contained in this permit with a view to minimizing waste of water and to meeting the reasonable water requirements of permittee without unreasonable draft on the source. Permittee may be required to implement such programs as (1) reusing or reclaiming the water allocated; (2) restricting diversions so as to eliminate agricultural tailwater or to reduce return flow; (3) suppressing evaporation losses from water surfaces; (4) controlling phreatophytic growth; and (5) installing, maintaining, and operating effi-

cient water measuring devices to assure compliance with the quantity limitations of this permit and to determine accurately water use as against reasonable water requirements for the authorized project. No action will be taken pursuant to this paragraph unless the Board determines, after notice to affected parties and opportunity for hearing, that such specific requirements are physically and financially feasible and are appropriate to the particular situation.

14. This permit does not authorize collection of water to storage outside of the specified season to offset evaporation and seepage losses or for any other purpose.

15. Permittee shall allow representatives of the State Water Resources Control Board and other parties, as may be authorized from time to time by said Board, reasonable access to project works to determine compliance with the terms of this permit.

16. In compliance with Section 5943 of the Fish and Game Code, permittee shall accord to the public, for the purpose of fishing, reasonable right of access to the waters impounded by the dam under this permit during the open season for the taking of fish subject to the regulations of the Fish and Game Commission.

17. Permittee shall install and maintain an outlet pipe of adequate capacity in his dam as near as practicable to the bottom of the natural stream channel, or provide other means satisfactory to the State Water Resources Control Board, in order that water entering the reservoir which is not authorized for appropriation under this permit may be released.

18. In accordance with the requirements of Water Code Section 1393, permittee shall clear the site of the reservoir of all structures, trees, and other vegetation which would interfere with the use of the reservoir for water storage and recreational purposes. This provision, however, shall not preclude the permittee from retaining vegetation cover in selected areas as required for the protection of wildlife. Clearing operations shall be coordinated with authorized increases in storage levels.

19. Rights under this permit are, and shall be, subject to existing rights determined by the Stanislaus River Adjudication Decree of Superior Court of San Joaquin County dated November 14, 1929, Action No. 16873 with Supplemental Decrees dated February 24, 1930; March 8, 1934; May 8, 1935 and November 29, 1960, insofar as said adjudicated rights are maintained, and such other rights as may presently exist.

20. The quantity of water diverted under this permit and under any license issued pursuant thereto is subject to modification by the State Water Resources Control Board if, after notice to the permittee and an opportunity for hearing, the Board finds that such modification is necessary to meet water quality objectives in water quality control plans which have been or hereafter may be established or modified pursuant to Division 7 of the Water Code. No action will be taken pursuant to this paragraph unless the Board finds that (1) adequate waste discharge requirements have been prescribed and are in effect with respect to all waste discharges which have any substantial effect upon water quality in the area involved, and (2) the water quality objectives cannot be achieved solely through the control of waste discharges.

21. In order to prevent degradation of the quality of water during and after construction of the project, permittee shall file immediately a report pursuant to Water Code Section 13260 and shall comply with any waste discharge requirements imposed by the California Regional Water Quality Control Board, Central Valley Region, or by the State Water Resources Control Board.

22. Before making any change in the project determined by the State Water Resources Control Board to be substantial, permittee shall submit such change to the Board for its approval in compliance with Water Code·Section 10504.5(a).

23. This permit shall be subject to appropriation by storage upstream from New Melones Reservoir for stockwatering and recreational purposes, provided the individual capacities of reservoirs for such purposes do not exceed 10 acre-feet and the reservoirs are kept free of phreatophytes.

24. This permit shall be subject to the following agreements between the permittee and other parties:

(a) The "Agreement and Stipulation" dated October 24, 1972 and executed by the permittee, Oakdale Irrigation District and South San Joaquin Irrigation District.

(b) The agreement between the permittee and Tuolumne County Water District No. 2 dated November 29, 1972.

(c) The agreement dated July 31, 1972 between permittee and Calaveras County Water District.

Reference to the above three agreements shall not be construed as a finding by the State Water Resources Control Board with respect to the rights of any of the parties involved.

25. This permit does not authorize the use of any water outside the counties of origin which is necessary for the development of the counties.