daction before this opinion issues is published.

STOCKTON EAST WATER DISTRICT, Central San Joaquin Water District, County of San Joaquin, City of Stockton, and California Water Service Company, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 04–541L.

United States Court of Federal Claims.

April 10, 2006.

Nancie G. Marzulla, Washington, DC, for plaintiffs. Roger J. Marzulla, Marzulla & Marzulla, Washington, DC; Jeanne M. Zolezzi and Jennifer L. Spaletta, Herum Crabtree Brown, of counsel.

Elsie B. Kappler, Washington, DC, with whom was Assistant Attorney General Sue Ellen Wooldridge, for defendant. William Shapiro and Adam J. Siegel, Department of Justice; Shelly Randel, Attorney/Advisor, Officer of the Solicitor, Branch of Water and Power, Department of the Interior; and James E. Turner, Assistant Regional Solicitor, Pacific Southwest Region, United States Department of the Interior, Sacramento, CA, of counsel.

John D. Echeverria, Georgetown Environmental Law & Policy Institute, Washington, DC, and Hamilton Candee, for amicus curiae Natural Resources Defense Council, San Francisco, CA.

### OPINION

MILLER, Judge.

In the dry western regions of California, water can be as precious as gold. Pitting institutional consumers against the environment, the instant case presents a complicated dispute regarding how state-controlled water, captured and contained in a federal reservoir, should be distributed and used.

The municipal-entity plaintiffs contracted for a share of this water, but contend they received less than they bargained for. The United States Bureau of Reclamation is the entity that controls the reservoir and distributed some of its water for environmental purposes rather than to fulfill the requests made by the plaintiffs. Both plaintiffs and defendant moved for summary judgment on the issue of whether defendant's failure to fulfill completely plaintiffs' requests for water constitutes a material breach of the parties' contract.[1]

### FACTS

#### I. Background information

Plaintiffs are Stockton East Water District ("Stockton East"), Central San Joaquin Water Conservation District ("Central"), City of Stockton, County of San Joaquin, and California Water Service Company ("California Water"), each of which is involved with the provision of municipal, industrial, and agricultural water, as well as the operation and maintenance of water facilities, within California's San Joaquin Valley. This case involves a dispute over two 1983 agreements involving Stockton East, Central, and the United States Bureau of Reclamation ("Reclamation") for the appropriation of water from California's New Melones Dam.

The facts in this case were recited previously when the court denied defendant's motion to dismiss, Stockton E. Water Dist. v. United States, 62 Fed.Cl. 379 (2004), and will be repeated only as necessary for the resolution of the parties' cross-motions for summary judgment. In addition, the United States Supreme Court in a related proceed-

---

1. To call these cross-motions "summary," however, is to do great injustice to the concept of adjudication based on a record presented by briefs, rather than trial. The 187 pages of briefs that comprise the cross-motions do not represent an unusual amount of legal argument, but the 2,706 pages of documents that were filed as appendices to the briefs presented a daunting task. To rule out that a genuine issue of material fact could lurk in a passage of just one document demands a sensor, but a judge uses his mind, not a probe. While it is conceivable that cross-motions for summary judgment containing a wealth of material can be resolved without trial, it seems unlikely as a general proposition and cannot occur in this case, in particular. These complex issues must be resolved by trial, as discussed more fully below.

ing rendered an excellent history of Western water rights, up to and including the formation of the New Melones Dam. *See Cal. v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). This history provides background information relevant to the cross-motions, but need not be rewritten here. The court limits itself to the relevant facts not in dispute between the parties.[2]

### 1. *Relevant parties and locations*

Plaintiff Stockton East is the signatory to one of the two contracts with Reclamation. Stockton East is a public agency in San Joaquin County. Special act of the California Legislature formed it in order to provide both irrigation and drinking water to the residents of San Joaquin County and the City of Stockton. *See* 1971 Cal. Stat. Chap. 819.

Plaintiffs California Water, the City of Stockton, and the County of San Joaquin claim third-party beneficiary status to the Stockton East–Reclamation contract. California Water is a corporation that contracts for a portion of Stockton East's treated water and then provides that treated water to the residents of the City of Stockton. The City of Stockton and the County of San Joaquin are eponymous local government entities.

Plaintiff Central is the signatory to the second contract with Reclamation. Central is a water conservation district organized under the California Water Code, formed with the specific purpose of contracting with the Central Valley Project. California Water Code §§ 74000–76501 (2000). Central also is located in San Joaquin County, but to the south of Stockton East. The entire district overlies a groundwater basin that is in a state of severe overdraft, thereby limiting one possible source of water to the area.

Reclamation administers the New Melones Dam and its allocations of water. The New Melones Dam (the "Dam") is part of the Central Valley Project, a federal reclamation project authorized by the Flood Control Acts of 1944 and 1962 and the Central Valley Project Improvement Act of October 30, 1992. Flood Control Act of Dec. 22, 1944, Pub.L. No. 78–534, § 10, 58 Stat. 887, 900–02; Flood Control Act of Oct. 23, 1962, Pub.L. No. 87–874, § 203, 76 Stat. 1173, 1191–92; Central Valley Project Improvement Act of October 30, 1992, 106 Stat. 4706. The Dam is located on the Stanislaus River approximately sixty miles upstream from its confluence with the San Joaquin River and forty miles east of Stockton, California. The resulting New Melones Reservoir (the "Reservoir") has a capacity of 2.4 million acre-feet of water.

### 2. *Chronological overview of the dispute*

While the disputed contracts were signed on December 19, 1983, the interpretation of their terms, and the defendant's liability for any breach, are both tied intricately to events occurring both before and after the signing. A brief chronological overview will aid in disposition; more detail is provided topically below.

The roots of this dispute run deep. In 1962 Congress authorized the New Melones Dam. Construction was finished in 1978. However, before the resulting reservoir could be filled, the Federal Government was obliged to apply for and receive appropriate permits from the State of California (the "State"). These permits were acquired in 1973, but the Federal Government disputed whether it was required to follow demands put upon it by the State. The legal battles surrounding these conditions were decided in the State's favor in 1978. One of the conditions with which the Federal Government had to comply in order to fill the reservoir was to commit a certain amount of water-the quantity set by the State-to fish and wildlife uses. Another condition was that the Federal Government have firm commitments from

---

**2.** If a case cannot be decided fully on a summary judgment motion, RCFC 56(d), the court should ascertain what material facts are actually in good faith disputed, "if practicable." Of the roughly 252 pages of responses and counter-responses to Plaintiffs' Proposed Findings of Uncontroverted Fact and *Defendant's Proposed Findings of Uncontroverted Fact,* few enumerated pages reflect agreements that are not pettifogged by either or both sides to the extent that they can be set forth as factual findings.

entities that would use the New Melones Reservoir water before filling the reservoir.

In order to fulfill the requirements of the State, Reclamation entered into negotiations with and received commitments to use the New Melones Reservoir water from Stockton East and Central. Reclamation then began filling the reservoir, which was completed in 1983.

On December 19, 1983, Reclamation entered into separate contracts with Stockton East and Central for delivery of certain quantities of water from the New Melones Reservoir. However, performance on the contracts followed the occurrence of certain preconditions. Per the contracts, Reclamation first formally declared that water was available—a declaration that did not go into effect until January 1, 1989. Thereafter, Stockton East and Central had until January 1, 1994, to build appropriate facilities to transport water from the Reservoir to the appropriate areas.

In 1993 the Central Valley Project Improvement Act tit. XXXIV, Pub.L. No. 102–575, 106 Stat. 4600, 4706–31 (1992) (the "CVPIA"), became effective. This law increased the amount of water that Reclamation was required to release for environmental purposes. The parties agree that, because of these changes in environmental law, Reclamation was required to release more water for fish and water quality needs and this, at least in part, contributed to the fact that plaintiffs received less water.

## II. *Requirements of law and regulation existing prior to the contracts*

With the Flood Control Acts, Congress directed that Reclamation construct and operate the Dam "pursuant to the Federal reclamation laws." Flood Control Act of Oct. 23, 1962, Pub.L. No. 87–874, § 203, 76 Stat. at 1191. The Reclamation Act of 1902, Pub.L. No. 57–161, § 8, 32 Stat. 388, required Reclamation to apply for appropriate state permits. The relevant state water-control entity is the California State Water Resources Control Board (the "State Water Control Board" or the "Water Control Board"). The Water Control Board granted Reclamation the required permit, but subject to twenty-five conditions with which Reclamation was required to comply if it wished to appropriate the water to fill the Reservoir.[3] *See* New Melones Project Water Rights Decision, Cal. State Water Res. Control Bd., Decision 1422 (Apr. 14, 1973) (hereinafter "New Melones Project Water Rights Decision").

One of these requirements was that, before Reclamation could fully appropriate the water, it must demonstrate "firm commitments" or a specific plan for its use. *See Cal.,* 438 U.S. at 652, 98 S.Ct. 2985. "[T]he Board, in effect, said to [Reclamation], 'Show us your contracts and your ability to deliver the water and it may be available to you.'" *United States v. Cal. State Water Res. Control Bd.,* 694 F.2d 1171, 1177 (9th Cir.1982) (quoting *United States v. Cal.,* 509 F.Supp. 867, 886 (E.D.Cal.1981)). In part to demonstrate such plans or commitments, Reclamation entered into contract negotiations with Stockton East and Central for the use of some of the New Melones water. These negotiations aided Reclamation in receiving approval from the State Water Control Board to appropriate water for the Reservoir. When presented with the contracts, the Water Control Board stated that, "[b]ased on the foregoing, we find that [Reclamation] has established that it has firm commitments to deliver the full yield of New Melones water for consumptive uses." Order Amending Water Right Decision 1422 Authorizing Storage in New Melones Reservoir for Generation of Hydroelectric Power & for Consumptive Uses, Cal. State Water Res. Control Bd., WR 83–3 (Mar. 8, 1983) (hereinafter "Order Amending Water Right Decision 1422").

Another requirement of the State Water Control Board was that a portion of the estimated 2.4 million acre-feet of potential reservoir water be reserved for environmental purposes. First, the Water Control Board mandated that 98,000 acre-feet of water be released annually for fishery and wild-

---

**3.** This decision sparked the litigation in *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), wherein the United States Supreme Court ultimately ruled that the Federal Government must comply with the state-imposed conditions.

life purposes, reduced to 69,000 acre-feet in dry years. New Melones Project Water Rights Decision at 21. Second, the Water Control Board dictated that an amount of water be released that was sufficient to dilute the lower San Joaquin River flow to a dissolved solids level of 500 parts per million or less. *Id.* at 11. The Water Control Board estimated that meeting this stipulation would require an annual release of not more than 70,000 acre-feet of water. *Id.* In both circumstances the Water Control Board reserved jurisdiction, so that it might revise the amount of water required to be released if it found the need. *See id.* at 13, 21.

In addition to complying with the requirements of the Water Control Board, the United States Department of the Interior ("Interior") was required by the Flood Control Act of 1962 to "determine the quantity of water required to satisfy all existing and anticipated future needs within the [Stanislaus River] [B]asin ...." Pub.L. No. 87–874, § 203, 76 Stat. 1173. The in-basin needs were deemed superior to other uses for the water. *Id.* Interior completed this study on April 20, 1981, and issued its Record of Decision on June 29, 1981. The opinion estimated the long-term in-basin needs to be 131,000 acre-feet per year. The opinion also followed the State Water Control Board in anticipating 70,000 acre-feet of water per year for water quality objectives and 98,000 acre-feet of water for fishery purposes. After meeting these requirements, Interior anticipated there would be sufficient water remaining to supply certain amounts to Stockton East and Central.

### III. The contracts between Stockton East, Central, and Reclamation

Following these preparations and negotiations, on December 19, 1983, Reclamation signed separate, but almost identical, contracts with Stockton East and Central.

These contracts provided for the supply of certain quantities of water on an annual basis, although the proper interpretation of these contracts is at the heart of the current dispute. In particular, the parties disagree regarding under what circumstances, and in what quantities, Reclamation would be required to deliver the water, and whether subsequent changes in environmental laws elsewhere requiring the provision of Central Valley Project water excused Reclamation's performance. Because this dispute is a matter of contract interpretation, important provisions will be quoted.[4]

### 1. Provisions incorporating laws and regulations

As the history of this dispute framed itself, it has become clear that the New Melones Dam, and the Central Valley Project generally, are creatures of statute and that their related contracts were made subject to certain laws. The Explanatory Recitals to the Stockton East Contract state that the New Melones Dam was "transferred to the Secretary of the Interior to become an integral part of the Central Valley Project to be operated and maintained pursuant to the authorizing acts and Federal reclamation laws[.]" Contract Between the United States and Stockton–East Water District Providing for Project Water Service ("Stockton East Contract"), Explanatory Recitals at 2. Plaintiffs "desire[d] to contract pursuant to Federal reclamation laws and the laws of the State of California, for water service from the Central Valley Project pursuant to the conditions" set forth in the contracts. *Id.* at 3.

The parties agreed that "the delivery of irrigation water ... pursuant to this contract is subject to the acreage and ownership limitations and pricing provisions of Reclamation law, as amended and supplemented ...." *Id.* art. 12(a). The contract mentions several

---

4. Unless indicated otherwise, all quotations and citations are to the Stockton East Contract with Reclamation. However, the contract with Central is, for most relevant purposes, identical. Where salient differences between the two contracts exist, they are noted. In brief, the contracts differ in only three substantive ways: (1) 75,000 acre-feet of water is made available to

Stockton East, while 80,000 acre-feet is made available for Central; (2) Stockton East's water supply is "interim," while Central's water supply is partially "firm" and partially "interim;" and (3) Stockton East's water is designated for agricultural use, as well as municipal and industrial use, while Central's water is designated only for agricultural use.

specific Reclamation laws, but does not expressly limit itself to them. *Id.* Preamble at 1, Explanatory Recitals at 2, art. 12(a).

Stockton East and Central also committed to follow any regulations created by the Department of Interior regarding "the enforcement and administration of [the art. 12(a)] limitations and provisions of Reclamation law as amended and supplemented by the Reclamation Reform Act of 1982 ...." *Id.* art. 12(b). Stockton East and Central agreed to follow any rules made by the contracting officer that were "consistent with the provisions of [the] contract, the laws of the United States and the State of California ...." *Id.* art. 12(c).

Finally, as discussed in more detail below, the contract states that "water availability shall not be declared until all applicable requirements of State and Federal law with respect to utilization and delivery of Stanislaus River water for the purpose of this contract have been complied with[.]" *Id.* art. 2(b).

The parties disagree as to whether these provisions are intended to incorporate future Reclamation laws or only those existing at the time of the contract. Even if future laws are incorporated, the parties disagree on the effect, if any, on the duties and liabilities of Reclamation.

### 2. *Construction of facilities*

In order to receive this water, Stockton East and Central were required to "construct and install," at their own expense, water delivery systems to carry the water from the Reservoir to the water district facilities. *Id.* art. 7(a). These facilities were substantially in place by December 31, 1994. Stockton East, relying on its contract with Reclamation, contracted with California Water, the City of Stockton, and other water districts to provide them with the water it purchased from the New Melones Reservoir. In exchange, they gave Stockton East assistance with the financing of the water delivery systems.[5] Plaintiffs allege that the cost of the entire delivery system exceeded $65 million.

### 3. *Provisions regarding availability of water*

The parties agree that both contracts recognize the water needs of Stockton East and Central and set out a plan for filling those needs. The Stockton East contract recites that "investigations by the United States indicate that the [plaintiffs have] a present and potential need for an irrigation and municipal and industrial water supply[,]" and that "Stockton–East Water District has sought a long-term water supply from the Folsom South Canal of the Central Valley Project which is not currently available[.]" Stockton East Contract, Explanatory Recitals, at 2. The contract announces that the New Melones Reservoir could fill this need, stating that "the United States is constructing and operating the Central Valley Project ... for the purpose, among others, of furnishing water for irrigation, municipal, industrial, domestic, and other beneficial uses[.]" *Id.* Explanatory Recitals at 1.

The contract recites that water was available to fill this need. First, the contract notes the requirement of the Flood Control Act of 1962: Before providing water to entities outside the Stanislaus River Basin, the "Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin ...." *Id.* Explanatory Recitals at 2. However, the contract stated that the Secretary made a determination of the needs of the Stanislaus River Basin on June 29, 1981, and, even after providing for those needs, the Secretary's investigation "indicate[d] that there [would] be an interim water supply available from the Central Valley Project for furnishing to the [plaintiffs] for surface diversion and direct application for irrigation and municipal and industrial and other purposes[.]" *Id.* at 2–3.

In addition, the contract states that "water availability shall not be declared until all applicable requirements of State and Federal law with respect to utilization and delivery of

---

**5.** Central did not help to fund the water delivery system. Instead, it pays the other plaintiffs for

its use.

Stanislaus River water for the purpose of this contract have been complied with[.]" *Id.* art. 2(b). Reclamation ultimately issued this declaration of availability by letter dated May 5, 1988, following the State Water Control Board's issuance of Decision 1616 in January 1988. *See* Petition for Assignment of Application 14858 and Applications 27319, 27320 and 27321 of the U.S. Bureau of Reclamation Stanislaus River, State Water Resources Control Board, Decision 1616 (Jan. 1988).

### 4. *Provisions regarding the amount of water received*

The parties agree that Article 3 of both contracts provides the formula by which water was to be made available to Stockton East and Central (though defendant argues it is qualified heavily by the provisions of Article 9). Article 3(b) of the Stockton East contract reads:

> Subject to the terms and conditions herein stated, the United States shall make available annually to the Contractor a maximum of 75,000 acre-feet of interim water: *Provided,* That this quantity may be increased pursuant to subdivisions (f) and (g) of [Article 3]: *Provided further,* That if the total water quantity is reduced pursuant to subdivision (a) of [Article 3], the maximum and minimum quantities of specified in subdivisions (c) and (d) shall be adjusted proportionally to such reduction or otherwise adjusted in a manner mutually agreed to by the Contracting Officer and the Contractor ....

Stockton East Contract art. 3(b).[6]

Subsections (c) and (d) deal with agricultural water and municipal/industrial water, respectively. Both subsections specify both a maximum and minimum amount of water per year that plaintiffs could purchase. Regarding the maximum, both contracts state that, in general, "the United States shall make available to the Contractor ... up to a maximum quantity of [agricultural or municipal/industrial water] as specified in the schedule submitted by the Contractor ...." *Id.* art. 3(c). This schedule is detailed in Article 4 that stipulates that "[f]or each year [of the contract], the Contractor will submit a schedule ... indicating the amounts of agricultural and [municipal/industrial] water required monthly." *Id.* art. 4(a). The maximum of agricultural water was set to 65,000 acre-feet per year, and the maximum of municipal and industrial water was set to 10,000 acre-feet per year. Therefore, plaintiffs were to submit a schedule specifying the amount of water that they wished to purchase for the year, up to those maximum amounts.

However, plaintiffs also were required to pay for certain minimum quantities of water every year. These minimums were specified in subsections (c) and (d) of Article 3. Subsection (c)(1) states that for the first five years after water officially has became available for delivery plaintiffs are not obligated to purchase a minimum quantity of water.[7] This corresponds to the time period starting on January 1, 1989, and ending on January 1, 1994. However, subsection (c)(2) provides increasing minimums for years six through ten of the contract, or from January 1, 1994, to January 1, 2004. If plaintiffs requested more water than the annual minimum during this period, this amount became the new minimum for each subsequent year until exceeded by the other contractual minimums. Subsection 4(c)(3) states that the amount of water scheduled in year eleven of the contract–2004–would be the minimum amount of water that plaintiffs must purchase from then on. Subsection (d) lists the minimum quantities of municipal and industrial water plaintiffs must purchase. These quantities were specified by table and followed a similar "step-up" pattern.

---

6. *The Central Contract differs in two relevant respects. First, it provides a maximum of 80,000 acre-feet of water annually, instead of 75,000 acre-feet. Central Contract art. 3(b). Second, it provides for a maximum amount of 49,000 acre-feet annually of firm water, with the remaining 31,000 acre-feet being interim water. Id.*

7. It is undisputed that deferral of the obligation to purchase water was to provide time for plaintiffs to build the necessary facilities to transport the water.

Article 3(f) gives the parties the option to increase the maximum annual quantity of water above 75,000 acre-feet for Stockton or 80,000 acre feet for Central by mutual agreement of Reclamation and the contracting party. If the maximum amount was increased, the "minimum annual quantities specified in subdivisions (c) and (d) . . . shall be adjusted proportionally . . . ." *Id.* art. 3(f).

While subdivision (f) relates to possible increases in the maximum water supply for the remaining duration of the contract, subdivision (g) deals with an increase in total water supply for a single year. It states that, "[i]f the Contractor in any year requires a quantity of water in addition to the maximum quantities stated in subdivisions (b), (c), and/or (d) herein which the United States is obligated to furnish"-in other words, the maximum annual amounts total 75,000 acre-feet of water for Stockton and 80,000 acre-feet of water for Central-then "additional Project water, if available as determined by the Contracting Officer, may be furnished . . . ." *Id.* art. 3(g). However, in contrast to the 75,000 or 80,000 acre-feet of water that Reclamation is "obligated" to provide, if Stockton East or Central were given this additional water in a year, it would "neither entitle nor obligate the Contractor to receive or pay for such quantities in subsequent years." *Id.*

The parties agree that these provisions, taken together, provide a step-up schedule of water that sets out both minimum amounts that plaintiffs were required to purchase (if not receive) and maximum amounts that they were allowed to purchase. The parties agree that, when plaintiffs submitted a valid schedule to Reclamation asking for a valid amount of water, they were entitled to receive that water unless Reclamation was excused from providing it under another section of the contract, most notably the provisions of Article 9.[8]

### 5. Clauses specifying reductions of water provided to plaintiffs

Plaintiffs contend that Reclamation could reduce or withdraw "interim water" supplies that the parties contracted for in four circumstances, as provided by the contract. First, supplies could be reduced by mutual agreement of the parties. Stockton East Contract art. 3(h). Second, on one year's prior written notification, supplies could be reduced or withdrawn for agricultural and municipal water needs within the basin. *See id.* art. 3(a). Third, the interim water supplies could be reduced in dry or critically dry years. *Id.* Fourth, supplies could be reduced due to shortages caused by circumstances beyond the control of the United States. *Id.* art. 9. Each will be described in more detail.[9]

The first method by which the water supply to plaintiffs can be reduced contractually is by mutual agreement of the parties. Article 3(h) of the contract states that "[t]he United States and the Contractor by mutual agreement may reduce the annual quantity of water which the United States is obligated to make available and the Contractor obligat-

---

**8.** Defendant flirted with the idea that Reclamation was only required by Article 3 to provide each plaintiff with the minimum amounts of water listed for each. *See* Def.s' Br. filed Oct. 26, 2005, at 23. In this scheme, the "maximum" quantity was the high-water mark that Reclamation might consider awarding in a given year, but that there was "no assurance" that plaintiffs would receive that amount. *Id.* However, defendant disavowed this theory during oral argument. *See* Transcript of Proceedings, *Stockton E. Water Dist. v. United States,* No. 04–541L, at 65–66 (Fed.Cl. Jan. 6, 2006) ("Tr.").

**9.** Preliminarily, one salient difference between the two contracts should be observed. The Central Contract had a portion of its water supply designated as "firm water," as distinct from the "interim water" making up the remainder of the Central Contract's water supply and the entirety

of the Stockton East Contract's water supply. The Central Contract defined the phrase "firm water" to mean "the maximum amount of water that can be provided each year on a usable pattern to meet Project obligations, with allowable deficiencies in dry or critically dry years." Central Contract art. 1(g). By contrast, the contracts defined "interim water" to mean "that portion of the water supply available from the New Melones Unit during the buildup to full Basin requirements which will be withdrawn as the needs within the Basin develop." Stockton East Contract art. 1(g). Plaintiffs contends that the "firm water" portion of the Central Contract, therefore, cannot be withdrawn for agricultural and municipal water needs within the basin. While this distinction is interesting, it is apparently moot, as it is undisputed that water was never withdrawn for in-basin needs.

ed to pay for during the remainder of the term of this contract." Stockton East Contract art. 3(h). Such a mutual agreement may have occurred in the instant case. The parties allegedly agreed to the New Melones Interim Plan of Operation in 1997, which may have represented a mutual agreement to modify the original contracts under this subsection of Article 3.[10] The interpretation of this agreement is disputed.

Second, the interim portion of plaintiffs' contractual water supply could be reduced or withdrawn to service "in basin" needs. Article 3(a) states that, "[a]s the Basin use develops[,] ... the Contractor's interim water supply may be reduced for subsequent years as determined by the Contracting Officer upon a minimum of one year written notification to the Contractor." *Id.* art. 3(a). The "Basin" is defined by the contract to be "the Stanislaus River Basin area for which a reservation of water is required by the Flood Control Act of 1962 ...." *Id.* art. 1(d). In other words, the Stanislaus River Basin was to be given contractual priority over plaintiffs' rights to the interim portion of their water supply.[11] However, it is undisputed that Reclamation never invoked this provision.

Third, the interim portion of the plaintiffs' contractual water supply also could be reduced in certain circumstances in order to provide water to the South Delta Water Agency in dry and critically dry water years, if that agency signed a contract with Reclamation. *Id.* art. 3(a). Nonetheless, it is undisputed that the South Delta Water Agency never signed such a contract with Reclamation and that Reclamation never reduced plaintiffs' water supply under this provision.

Fourth, plaintiffs' water supply could be reduced by circumstances "beyond the control of the United States." *Id.* art. 9(a). The parties vigorously dispute the proper interpretation of this provision, which reads in full:

In its operation of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall [accrue] against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

*Id.*

Plaintiffs argue that this language is, in effect, an "act of God" provision that only excuses performance in circumstances such as drought or similar natural disaster. Defendant, on the other hand, takes the position that the language is testament that Reclamation did not breach, because the changes in relevant regulations were circumstances "beyond the control of the United States[.]" *Id.* Moreover, defendant argues that, under this provision, as long as Reclamation acted "reasonably" in its attempts to avoid water shortages, the Federal Government can never be liable for a failure to provide water. This argument is the heart of the dispute.

### 6. *Discretion of the contracting officer under Article 9(a)*

Defendant and amicus curiae Natural Resources Defense Council contend that interpretation of a cause "beyond the control of the United States" in Article 9(a) lies primarily with the contracting officer and the contract provides that his decision should not be reconsidered unless it is arbitrary, capricious, or unreasonable. Article 9(a), quoted in full above, provides that "if a shortage does occur during any year because of

---

10. The court notes that while defendant claims that Stockton East and Central "participated in, negotiated and ultimately agreed to the [1997 New Melones Interim Plan of Operations] for valuable consideration," Def.'s Br. filed Oct. 26, 2006, at 18, the version included in the record does not include the signatures of Stockton East or Central.

11. The portion of Central's water supply that was earmarked as "firm" would not be subject to reduction under the equivalent Central Contract provision.

drought, or other causes which, *in the opinion of the Contracting Officer,* are beyond the control of the United States" the United States shall not be liable. *Id.* art. 9(a) (emphasis added). Article 12(d) of the contract further provides that,

> [w]here the terms of this contract provide for action to be based upon the opinion or determination of either party to this contract, whether or not stated to be conclusive, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations.

*Id.* art. 12(d). Therefore, according to defendant and amicus, if the contracting officer decided pursuant to authority granted him by Article 9(a) that the water shortages were "beyond the control of the United States," plaintiffs cannot challenge that determination unless it is arbitrary, capricious, or unreasonable.

Plaintiffs respond that the contracting officer only issued a determination of shortage in 1994, which was a year of drought. Plaintiffs also point out that Article 12(d) provides for an appeal of the contracting officer's factual determinations to the Secretary of the Interior by the contractor. This right of appeal was never available to plaintiffs in the instant case because the contracting officer never made factual determinations of a shortage under Article 9(a), save in 1994.

### 7. Damages and adjustments under the contracts

Even if Reclamation is liable for breach, defendant and amicus argue that plaintiffs' sole remedy is for a "refund of amounts previously paid or credits against future water deliveries." Amicus Br. filed Jan. 3, 2006, at 21. For this proposition, they cite Article 6 of the contracts, which reads:

> The amount of any overpayment by the Contractor due to the quantity of water actually available for the Contractor during any year, as determined by the Contracting Officer, having been less than the quantity for which the Contractor was required to pay shall be applied first to any accrued indebtedness then due and payable by the Contractor pursuant to this contract. Any amount of such overpayment then remaining shall ... be refunded to the Contractor .... Such adjustments shall constitute the sole remedy of the Contractor ....

*Id.* art. 6.

Plaintiffs counter that provisions of Article 5 of the contracts often required them to pay in advance of receiving the water. Article 6, then, deals with the consequences that would occur if plaintiffs paid for water that they did not receive. Plaintiffs posit that this provision did not contemplate breach of the contract and did not limit damages in the case of breach. *See* Transcript of Proceedings, *Stockton E. Water Dist. v. United States,* No. 04–541L, at 26 (Fed.Cl. Jan. 6, 2006) ("Tr.") (agreeing with the court's statement that the "[t]he adjustment article, Article 6, is addressed to an overpayment situation").

### IV. *Subsequent changes in laws and regulations*

At the time the contracts were signed in 1983, the State Water Control Board anticipated that the annual release from the New Melones Reservoir of 98,000 acre-feet of water for fishery purposes (or 69,000 acre-feet in dry years) and not more than 70,000 acre-feet of water to increase the dissolved oxygen content and salinity levels would be sufficient to satisfy area water standards. However, federal law later revised upwards the goals for fish, oxygen content, and salinity in the Central Valley Project area.

First, the CVPIA, incorporated the requirements of the Endangered Species Act, 16 U.S.C. §§ 1531–1544. CVPIA § 3406(b). The CVPIA also provides that the Secretary of the Interior (the "Secretary"), who was responsible for operation of the Central Valley Project, should "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this [Act.]" CVPIA § 3406(b)(2). In addition, the CVPIA required the Secretary to "obtain a modification in [preexisting permits and licenses] in a manner consistent with ... State law" before

reallocating water to accomplish the goals of the CVPIA. CVPIA § 3411(a).

Second, the State Water Control Board later revised its requirements when in 2000 it issued order D–1641, which modified the New Melones water right permits to require State Water Control Board objectives in water quality to be met before water is used for consumptive uses. However, plaintiffs represent that the State Water Control Board's subsequent decisions did not require Reclamation to release additional water specifically from New Melones. *See* Pl.'s Br. filed Nov. 28, 2005, at 9 (claiming that "the State Board reserved jurisdiction, [but] ... never exercised it[ ] ... to require the United States to release more water from New Melones for any purpose"); Tr. at 46 ("Had the state required that 800,000 acre[-]feet be taken away from the contractors and given to the fish, we wouldn't be here today.... That water was under state law committed to the contractors in 1992, and by force of ... the passage of CVPIA, was taken away from those irrigators and given to the fish.").

Despite any changes in the amount of water required for other purposes, plaintiffs argue that Reclamation was still obligated to fulfill its contract or pay for its breach. Defendant rejoins that under various theories its performance either was fulfilled or any liability excused.

## PROCEDURAL BACKGROUND

This case originally was filed in United States District Court for the Eastern District of California in 1983 and was transferred to the United States Court of Federal Claims on April 1, 2004, as a takings claim. On April 20, 2004, plaintiffs amended the complaint to include a breach of contract claim. Defendant then filed a motion to dismiss, which was denied. This procedural history, including the rulings of the district court, are discussed in much greater detail in *Stockton E. Water Dist.*, 62 Fed.Cl. 379.

Currently before the court are cross-motions on the breach of contract claim. Defendant seeks summary judgment, and plaintiffs seek partial summary judgment. Plaintiffs argue that, as a matter of law, Reclamation breached its contracts to provide a specified amount of water to plaintiffs. Defendant contends that, as a matter of law, Reclamation did not breach its contract with plaintiffs because it either provided them with an amount of water consistent with the contract or, alternately, that the Federal Government is immune from liability under the sovereign acts doctrine and the unmistakability doctrine. Defendant also asks the court to dismiss plaintiffs California Water Service, the City of Stockton, and the County of San Joaquin because the law does not recognize them as proper third-party beneficiaries to the contract.

## DISCUSSION

### I. Standard of review

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such cases the need for a trial is not present, and the motion for summary judgment must be granted. Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999).

If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied. "The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the non-moving party's case[.]'" *Crown Operations Int'l v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed.Cir.2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. *Matsushita Elec. Indus.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments").

When resolving a motion for summary judgment, the court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are ... not [functions] of a judge ... ruling on a motion for summary judgment ..."); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1361 (Fed.Cir.1998) (holding that "[i]n determining the propriety of summary judgment, credibility determinations may not be made ..."). The purpose of summary judgment is " 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1). However, if "there is reason to believe that the better course would be to proceed to a full trial" a trial court may deny summary judgment. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## II. *Third-party beneficiary status*

Because plaintiffs California Water, the City of Stockton, and the County of San Joaquin receive water from the Stockton East, they claim to be third-party beneficiaries to the Stockton East–Reclamation Contract. Defendant disputes that these plaintiffs are intended third-party beneficiaries and contends that they are subject to dismissal or, in the alternative, that their claims should be adjudicated within the parameters of the Stockton East Contract as they have nothing to do with Central.

In order to qualify as third-party beneficiaries to a government contract, the parties must show that the United States waived its defense of sovereign immunity. *See Chancellor Manor v. United States*, 331 F.3d 891, 898 (Fed.Cir.2003). The Tucker Act, 28 U.S.C. § 1491 (2000), includes a waiver of the Government's sovereign immunity defense for claims "founded ... upon any express or implied contract with the United States ...." *Id.* at § 1491(a)(1); *see Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir.2005) (noting that the Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and ... waives the Government's sovereign immunity for those actions"). The court's Tucker Act jurisdiction extends only to plaintiffs in privity of contract with the Government. *Chancellor Manor*, 331 F.3d at 899 (holding that "for the government to be sued on a contract pursuant to the Tucker Act, there must be privity of contract between the plaintiff and the United States"); *see Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed.Cir.1994) (holding that "[a]bsent privity between [plaintiffs] and the government, there is no case").

One method of "establish[ing] privity of contract [is] if [plaintiffs] are intended third-party beneficiaries of a contract with the United States ...." *Chancellor Manor*, 331 F.3d at 901. Third-party beneficiary status is an "exceptional privilege." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed.Cir.2001), *amended on reh'g*, 273 F.3d 1072 (Fed.Cir. 2001) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912)). "[I]n order to prove third-party beneficiary status, [plaintiffs] must demonstrate that the contract ... reflects an express or implied intention to benefit the part[ies] ... directly[.]" *Chancellor Manor*, 331 F.3d at 901; *see also Flexfab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed.Cir.2005). Those parties who benefit indirectly or incidentally from a contract are not third-party beneficiaries. *See Chancellor Manor*, 331 F.3d at 901.

In delimiting direct and indirect beneficiaries of a contract, the United States Court of

Appeals for the Federal Circuit has cited favorably to the Restatement (Second) of Contracts. *See, e.g., Glass,* 258 F.3d at 1354 (citing section 302's "distin[ction] between a direct beneficiary and an indirect beneficiary, who is, at most, an incidental beneficiary with no rights to enforce the contract"); *Mont. v. United States,* 124 F.3d 1269, 1274 (Fed.Cir. 1997) (citing the language of section 302 of the Restatement). The Restatement's Section 302, Intended and Incidental Beneficiaries, states:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981). The Restatement clarifies in a comment that "[t]his section distinguishes an 'intended' beneficiary, who acquires a right by virtue of a promise, from an 'incidental' beneficiary, who does not." *Id.* § 302 cmt. a.

The intent of the contracting parties to provide a benefit to the third party is the "cornerstone of a claim for third-party beneficiary status." *Flexfab,* 424 F.3d at 1260. The intent to benefit the third-party must be clear. *Mont.,* 124 F.3d at 1273 (holding that third party "must fall within a class clearly intended to be benefitted" by the contract). However, "[t]he intended beneficiary need not be specifically or individually identified in the contract . . . ." *Id.* If this intent is not expressly stated, it may be deduced from evidence outside the contract. *Roedler v. Dep't of Energy,* 255 F.3d 1347, 1352 (Fed. Cir.2001). One method of ascertaining such intent is "to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Mont.,* 124 F.3d at 1273.

Plaintiffs cite *H.F. Allen Orchards,* 749 F.2d at 1576, a factually similar case, for the proposition that they are proper third-party beneficiaries. In *H.F. Allen Orchards,* the Federal Circuit stated that farmers were third-party beneficiaries to a contract between their area water district and Reclamation. The court reasoned that the "irrigation districts, which contracted with the Bureau, act as a surrogate for the aggregation of farmers. They use no water themselves." *Id.* However, that statement was dictum, coming as it did after the court's determination that the underlying cause of action sounded in tort rather than contract, depriving the Court of Federal Claims of its jurisdiction. See 749 F.2d at 1576. Plaintiffs also cite *Klamath Irrigation Dist. v. United States,* 67 Fed.Cl. 504, 533 (2005), another factually similar case. In *Klamath Irrigation* Dist. Judge Allegra ruled on summary judgment that individual irrigators were third-party beneficiaries to contracts between their water districts and Reclamation. However, that case is also distinguishable because a provision of the contract incorporated by reference some contracts between the water district and the individual irrigators. See 67 Fed.Cl. at 533.

Plaintiffs do not appear to dispute the fact that California Water, the City of Stockton, and the County of San Joaquin are not third-party beneficiaries to the Central Contract, as distinct from the Stockton East Contract. Therefore, defendant's cross-motion to disallow those three plaintiffs from enforcing the Central Contract is granted.

On the other hand, the question of whether California Water, the City of Stockton, and the County of San Joaquin are third-party beneficiaries to the contract between Reclamation and Stockton East is disputed. Although California Water, the City of Stockton, and the County of San Joaquin are not mentioned explicitly in the Stockton East Contract, plaintiffs contend that they are mentioned implicitly in several provisions. First, the contract states that "investigations by the United States indicate that [Stockton East] has a present and potential need for an irrigation and municipal and industrial water

supply[.]" Stockton East Contract, Explanatory Recitals at 2. Additionally, the contract requires that "[w]ater furnished to the Contractor pursuant to this contract shall not be sold, exchanged, or otherwise disposed of for use outside the Contractor's service area . . . ." *Id.* art. 10. Finally, the payment section of the contract characterizes Stockton East's requirement to pay for the water as an obligation "notwithstanding the manner in which the obligation may be distributed among the Contractor's water users." *Id.* art. 13. Plaintiffs put their argument pithily when they asked, if the city, county, and municipal water treatment facility were not intended by the parties to be the recipients of Reclamation's water, what on earth did Reclamation believe Stockton East was going to do with it? *See* Pls.' Br. filed Nov. 28, 2005, at 29.

Defendant, citing *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034–38 (9th Cir.2005), counters that writing a government contract "with a particular group in mind is not sufficient to demonstrate the contracting parties' intent to benefit that group." *Id.* at 1038. In addition, defendant offers affidavits to show that California Water, the City of Stockton, and the County of San Joaquin either did not participate in the negotiation and drafting of the water contracts or did not know if they participated. Only the City of Stockton was able to provide defendant with a specific amount of water to which it claims entitlement under the contract. Defendant interprets this evidence as showing that Reclamation did not intend to benefit these three parties in its contract with Stockton East.

The facts involving the intent of the parties regarding third-party beneficiary status are disputed and will be resolved at trial. Reclamation is an entity charged with the provision of irrigation water to users in dry areas. Stockton East is a public agency formed by special act of the California Legislature to provide both irrigation and drinking water to the residents of San Joaquin County and the City of Stockton. The court shares plaintiffs' basic incredulity that, when these two specially formed public entities contracted, they did not intend to benefit Stockton East's associated city, county, or water purification company. The contractual statements cited by plaintiffs, while ambiguous, provide some evidence of this. Defendant's affidavits, on the other hand, show only that the alleged third-party beneficiaries did not participate directly in the creation of the contract; this does not prove that the parties did not intend to benefit them. The court also notes that, while *H.F. Allen Orchards* and *Klamath Irrigation Dist.* are distinguishable, they do provide support for the proposition that, in factually analogous disputes, third-party beneficiary status has been granted. Therefore, the parties will prove their intentions at trial, citing evidence from outside the contract as needed to demonstrate whether Reclamation and Stockton East intended California Water, the City of Stockton, and the County of San Joaquin to be beneficiaries of their water contract.

## III. *The sovereign acts and unmistakability doctrines*

Defendant also asks for summary judgment on the grounds that, even if it is found in breach of the contract, the sovereign acts and unmistakability doctrines shield the Government from liability. Plaintiffs contend both that the sovereign acts doctrine would not apply and that defendant failed to plead these affirmative defenses in its answer and, therefore, waived them.

The general rule is that affirmative defenses are waived when not pleaded in the answer. *See Crocker v. United States*, 130 Ct.Cl. 567, 127 F.Supp. 568, 573 (1955); *Todd v. United States*, 155 Ct.Cl. 87, 292 F.2d 841, 845 (1961). However, the purpose of the rule is to "guarantee that the opposing party has notice of any additional issue that may be raised at trial so that [a party] is prepared to properly litigate it." *Hassan v. United States Postal Serv.*, 842 F.2d 260, 263 (11th Cir.1988) (citing *Blonder–Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)) (discussing Fed.R.Civ.P. 8(c)). Therefore, there are exceptions when "the plaintiffs have ably and thoroughly responded to the Government's arguments, showing no prejudice from the injection of the issue at this stage . . . ."

*Cities Serv. Helex, Inc. v. United States,* 211 Ct.Cl. 222, 543 F.2d 1306, 1313 n. 14 (1976). In such a case, the court "will consider the defense on the merits." *Id.* Plaintiffs' able and detailed response to the arguments of defendant and amicus in the instant case shows that plaintiffs were not prejudiced by defendant's late invocation of the defense of sovereign acts. The court will allow the defense to be raised.

■ The gravamen of the sovereign acts doctrine to immunize the Government for unintentional breaches of contract caused by the passage of laws of general applicability, *see, e.g., Centex Corp. v. United States,* 395 F.3d 1283, 1306–7 (Fed.Cir.2005), but not those laws specifically aimed at relieving the Government of contractual liability, *see, e.g., United States v. Winstar,* 518 U.S. 839, 895, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). "It has long been held by the Court of Claims that the United States when sued as a contractor cannot be liable for an obstruction to performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). However, "the sovereign acts doctrine does not apply to 'legislation targeting a class of contracts to which [the Government] is a party.'" *Centex,* 395 F.3d at 1306 (alteration in original) (quoting *Winstar Corp.,* 518 U.S. at 898 n. 45, 116 S.Ct. 2432).

■ As a precondition to excusing liability for breach under the sovereign acts doctrine, defendant bears the burden of showing that performance was impossible because of the legislation. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 619, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (observing that, in *Winstar,* the court characterized the "'sovereign acts' doctrine [as] ... treat[ing] certain laws as if they simply created conditions of impossibility"); *Winstar,* 518 U.S. at 904, 116 S.Ct. 2432 (holding that even if a sovereign act is implicated, "it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach"). If performance was indeed rendered impossible, then the sovereign acts

doctrine may make Reclamation immune to liability for its breach. The court must first decide whether the Government action preventing performance of the contract is "public and general." *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1574 (Fed.Cir. 1997). If the action is "public and general," then the court must proceed to step two and determine whether the contract contains an "unmistakable promise" that the Government would refrain from exercising its sovereign power. *Yankee Atomic Elec.,* 112 F.3d at 1578. If the act is public and general and the contract does not contain an unmistakable promise to refrain from exercising sovereign power, then Reclamation is immune from liability.

■ However, if the legislation preventing performance of the contract is not general and public, the Government will not be immune from liability. The court must decide if, instead, the legislation is targeted at specific contracts with the "substantial effect of releasing the Government from its contractual obligations." *Winstar,* 518 U.S. at 899, 116 S.Ct. 2432. If true, the sovereign acts doctrine does not apply, and Reclamation is not immune. *Id.* This is because "[t]he Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." *Yankee Atomic Elec.,* 112 F.3d at 1575. "If the Government is to be treated like other contractors, some line has to be drawn in situations like the one before us between regulatory legislation that is relatively free of Government self-interest ... and, on the other hand, statutes tainted by a governmental object of self-relief." *Winstar,* 518 U.S. at 896, 116 S.Ct. 2432. "The sovereign acts doctrine attempts to 'balance[ ] the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor.'" *Yankee Atomic Elec.,* 112 F.3d at 1575 (alteration in original) (quoting *Winstar,* 518 U.S. at 893, 116 S.Ct. 2432). Finding this balance requires "not a hard and fast rule, but rather a case-specific inquiry that

focuses on the scope of the legislation in an effort to determine whether ... that legislation was designed to target prior governmental contracts." *Yankee Atomic Elec.*, 112 F.3d at 1575.

Defendant contends that the CVPIA was "legislation ... enacted for several public and general purposes, including protection and enhancement of fish and other wildlife, improving the operational flexibility of the [Central Valley Project], increasing water-related benefits provided by the [Central Valley Project,] ... and achieving a reasonable balance among competing demands for [Central Valley Project] water ...." Def.'s Br. filed Oct. 26, 2005, at 46. Because this legislation was not directed at relieving the Government of contractual responsibilities, it is a "public and general" act that falls under the sovereign acts doctrine. As no "unmistakable promise" can be inferred that the Government would refrain from exercising its sovereign power, the unmistakability doctrine is not an obstacle, and the Government is immune from liability.

Plaintiffs challenge the notion that it was impossible for Reclamation to perform its contractual obligations to plaintiffs even under the CVPIA because the CVPIA allowed Reclamation to choose from which contractors it took the water. Plaintiffs' counsel contends that "the [G]overnment ... could have complied with CVPIA without taking water out of New Melones[,]" Tr. at 99, by "tak[ing] it from somebody else's clients," Tr. at 100. Plaintiffs' counsel represented at oral argument that other contractors for Central Valley Project water had different contracts that would not have been breached by taking water from them for CVPIA uses. *Id.* at 101–03. Because Reclamation could have avoided breaching its contracts with plaintiffs-and in theory, avoided breaching contracts with any other parties as well-while still finding the 800,000 acre-feet of water required to be released for fish under the CVPIA, performance of the Stockton East and Central Contracts was not impossible under the CVPIA.

In the alternative, plaintiffs argue that, even if performance was impossible, the CVPIA is not a public and general act under the relevant case law, but is an act targeted at specific contracts with the "substantial effect of releasing the Government from its contractual obligations." *Winstar*, 518 U.S. at 899, 116 S.Ct. 2432. Specifically, plaintiffs point to CVPIA § 3406(b)(2), and CVPIA § 3411(a). Section 3406(b)(2) authorizes Reclamation to "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this [Act.]" Section 3411(a) requires the Secretary to "obtain a modification in [preexisting permits and licenses] in a manner consistent with ... State law" before reallocating water. Because the vast majority of the Central Valley Project water was contracted out, the CVPIA both explicitly and implicitly orders Reclamation to breach or modify existing contracts to "take[ ] the water away from irrigation contractors and give[ ] it to fish." Tr. at 23. That said, plaintiffs concede that, if the court rules that the statute is not aimed specifically at relieving the Government from liability on some Central Valley Project contracts, the unmistakability doctrine will not help them—all parties agree that the contracts do not contain an "unmistakable promise" not to legislate.

The court finds that the possibility or impossibility of performance by Reclamation of its Stockton East and Central contracts constitutes a material dispute. Summary judgment on the issue thus is inappropriate. In order to take advantage of the sovereign acts doctrine, defendant has the burden of proving that performance in the face of the supposed sovereign act-in this case, the CVPIA-was impossible. Plaintiffs claim that, even with the passage of the CVPIA and its requirement that Reclamation must find 800,-000 acre-feet of Central Valley Project water, performance of the Stockton East and Central Contracts was possible because Reclamation could have taken the water from other contractors. Plaintiffs cite to at least one example of a contract that, in theory, would not have been breached by taking water for CVPIA purposes. *See* Tr. at 101–2 ("[T]ake, for example, the Westland's contract .... It

simply said [']any cause['] . . . . [T]he water could be taken and was taken from [there] . . . . So there are places [Reclamation] could have gone without breaching contracts . . . ."). On the other hand, defendant has provided no conclusive evidence that the CVPIA rendered performance impossible.

The facts regarding the possibility or impossibility of performance despite or because of the CVPIA are disputed and underdeveloped and must be established at trial. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Because impossibility of performance is a precursor to any determination that the Government is shielded from liability under the sovereign acts doctrine, the court should defer exploration of the legal intricacies of that doctrine. If it were later determined that performance indeed was possible despite the CVPIA, then any such premature utterances would be rendered improvident, if not presumptuous. The court would direct the parties' focus regarding the issue of impossibility to the question of whether other contracts actually existed that would not have been breached by taking water for the purposes of the CVPIA, as plaintiffs suggest. The alternative—a game of musical chairs, with each potential plaintiff claiming performance was not impossible because Reclamation could have breached someone else's contract—seems wholly unavailing.

If the court determines at trial that performance by Reclamation was impossible, then it will resolve the parties' arguments regarding whether the sovereign acts doctrine is applicable. This is a "case-specific inquiry" that determines whether the Government is acting as a contractor or a sovereign. *Yankee Atomic Elec.,* 112 F.3d at 1575. If the CVPIA is " 'legislation targeting a class of contracts to which [the Government] is a party[,]' " *Centex,* 395 F.3d at 1306 (quoting *Winstar,* 518 U.S. at 898 n. 45, 116 S.Ct. 2432), the sovereign acts doctrine will not protect defendant from liability. If the CVPIA is found not to be targeted so specifically, the Government will be immune from liability, as plaintiffs admit that the unmistakability doctrine is not applicable.

Defendant's cross-motion for summary judgment on the issue of the sovereign acts doctrine is therefore denied. The matter will be resolved at trial.

### IV. *Interpretation of the contract*

■ Material issues of fact exist that make full resolution of the issue of breach impossible at the summary judgment stage. The parties are in substantial disagreement on most key issues. In light of the complexity of the record, a trial is not only necessary, but also advisable to develop fully these issues. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, where possible, interpretation of portions of the contract will be resolved.

Plaintiffs moved for partial summary judgment against defendant on the issue of breach of contract. Because of the disputed issues of fact generated by defendant's cross-motion, as discussed below, plaintiffs' motion is denied.

Defendant invites the court to make four additional specific rulings as a matter of law. *See* Tr. at 49–50. The first finding sought is that Reclamation's duty to provide the plaintiffs with water was limited to the amount of water actually submitted by plaintiffs to Reclamation on the Article 4 schedules. Because the circumstances surrounding the submission of the schedules are disputed, the court declines to make the finding at this time. The second is that the Article 9 language regarding circumstances "beyond the control of the United States" eliminates liability. Because the phrase is ambiguous, trial will explore the parties' intent. The third would uphold the contracting officer's decision that a shortage existed pursuant to Article 9 as binding on the parties under Article 12, on the ground that his decision was not arbitrary, capricious, or unreasonable. The court declines to make this finding because the requirements for the issuance of such decisions and their form are disputed. Trial also will, if necessary, address whether such decisions were arbitrary, capricious, or unreasonable. The fourth finding sought is a determination that the only damages available to plaintiffs are accounting remedies as provided in Article 6. As a matter of law, the court interprets this provision to specify only the remedy in the case of overpayment; it is

not intended to be the exclusive remedy for all breaches.

### 1. *Standards of review: plain meaning, extrinsic evidence, and parol evidence*

The plain meaning rule contemplates that, where the provisions of an agreement " 'are clear and unambiguous, they must be given their plain and ordinary meaning,' and the court may not resort to extrinsic evidence to interpret them." *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir. 1996) (quoting *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993)). A contract provision is ambiguous when it is "susceptible to more than one reasonable meaning." *Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375–76 (Fed.Cir. 2004) (citing *Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir. 1986)). In determining whether a contract is ambiguous, it "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004). If a provision of the contract is deemed ambiguous, extrinsic evidence may be examined to clarify it. *See Sylvania Elec. Prod., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972). Even then, if the extrinsic evidence is conflicting, the court may not make credibility determinations, nor weigh any evidence, on a motion for summary judgment. Cf. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Rockwell Int'l Corp.,* 147 F.3d at 1361. In such a case, resolution of an ambiguity in the contract language must await trial, when conflicts in extrinsic evidence can be resolved.

In addition, under the parol evidence rule, extrinsic evidence that seeks to introduce or change a written term in an agreement is not admissible in most instances. *See David Nassif Assoc. v. United States,* 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977). The parol evidence rule is a rule of substantive law that "prohibits . . . the use of external evidence to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding." *David Nassif Assoc.,* 214 Ct.Cl.

at 419–420, 557 F.2d 249. Such an agreement is often called an integrated agreement. *See Barron Bancshares,* 366 F.3d at 1376. If an integrated agreement is "clear and unambiguous, we must construe [it] according to [its] plain meaning, without resort to parol evidence." *Id.; see also Short Bros., PLC v. United States,* 65 Fed.Cl. 695, 781 (2005) (holding that court may not use extrinsic evidence unless contract language is ambiguous). This rule, at its heart, is aimed at excluding additions or modifications to a written agreement. *See David Nassif Assoc.,* 557 F.2d at 256.

In the instant case, a blizzard of documents has wiped away any hope of a straight-forward contract interpretation. The parties cite both the parol evidence rule and the plain meaning rule in their discussion of extrinsic evidence, but both apparently agree that the extrinsic evidence cannot be considered to alter or add any contract terms. It is both obvious and undisputed that the two contracts at issue in this case are integrated agreements, *see Sylvania Elec. Prod.,* 458 F.2d at 1007 n. 9, and the court so rules as a matter of law. Therefore the parol evidence rule has little to do with the relevance of the extrinsic materials in the instant case.

Under the plain meaning rule, these extrinsic materials may be examined in situations where the court finds an ambiguity in the contract language. *Sylvania Elec. Prod.,* 458 F.2d at 1005. In evaluating a summary judgment motion, extrinsic evidence has value only as an interpretive tool for resolving ambiguities if the facts of the extrinsic evidence are not in material dispute. In the instant case, the parties manifest conflicts on most statements of fact, making resolution of ambiguities with extrinsic evidence an unlikely proposition on summary judgment.

### 2. *Undisputed provisions of the contract*

It is worth noting one significant area of contract interpretation upon which plaintiffs and defendant agree. The parties agree that these were enforceable contracts and that Reclamation did have a duty under the contracts to provide plaintiffs with at least the amount of water that they specified in

their schedules, albeit with limitations and provisos. See Tr. at 65–66. Therefore, defendant, in theory, admits liability in those situations where plaintiffs submitted valid schedules for water and Reclamation did not provide it, as long as Reclamation's performance was not excused by one of the other provisions of the contract-most notably, but not limited to, Article 9(a).

### 3. *Requirement for the submission of Article 4 water schedules*

Defendant asks the court to determine that Reclamation's duty to provide the plaintiffs with water was limited to the amount of water actually submitted by plaintiffs to Reclamation on the Article 4 schedules. Because plaintiffs did not submit these schedules in every year, and often submitted them for small amounts of water that Reclamation then provided, defendant has cross-moved for summary judgment on the issue of breach. Defendant argues that a breach situation could not occur if Reclamation provided plaintiffs with exactly the amount of water that they requested under the contract schedules.

Plaintiffs admit that they did not schedule water in some years and often submitted schedules for very low amounts of water, which duly was provided to them. See Tr. at 94–96. However, plaintiffs' counsel represented that this was because "the whole scheduling system ... broke down[.]" Tr. at 95. At some point during the contract, Reclamation began informing plaintiffs how much water they could schedule. Plaintiffs cited examples, including a letter from Thomas J. Aiken, Area Manager of Reclamation, to Kevin Kauffman, Manager of Stockton East Water District, dated June 4, 2002, which reads in part:

> This letter is to inform you of the water allocation forecast of May 16, 2002. The [Central Valley Project] East Side Division contracts will have a water supply allocation of 10 percent of their contract amount.

... Please submit a schedule of projected deliveries to reflect the 10 percent contract water allocation adjustment.

Plaintiffs contend that, "[t]he schedules in short, ... became meaningless[.]" Tr. at 95. Submitting them "was a futile exercise in legalism. Stockton East ... and Central could have submitted schedules ... every ... year and it would have had zero impact on the amount [of water] they were allocated because ... Reclamation had decided [they didn't] have enough water." *Id.* at 95–96.

This is a disputed issue of fact that trial will resolve. Even defendant, at oral argument, admitted that "[t]here is a lot of back and forth [on the issue of whether plaintiff didn't request water because Reclamation didn't issue it] .... [I]f there is a factual issue out there, that's certainly one of them." *Id.* at 109. In order to show liability, plaintiffs must offer a reasonable explanation, consistent with their obligations under the contract, for their failure to submit schedules or their submission of schedules for smaller-than-desired quantities of water. In order to establish damages, plaintiffs must prove the amount of water that they should have received above the reduced amount that they actually received. The cross-motions for summary judgment on breach are premature for those reasons.[12]

### 4. *Article 9(a) and Article 3(h) escape clauses*

If the court assumes that Reclamation was required to provide plaintiffs more water than was made available, despite the questions regarding the submission of schedules, the next issue is whether Reclamation's obligation to do so was excused by a provision of the contract. Of the four methods of providing lower amounts of water in the contract, two were not invoked: Reclamation did not transfer elsewhere any water for in-basin needs within the Stanislaus River basin, see Stockton East Contract art. 3(a), or sign any contract with the South Delta Water Agency, see *id.* Therefore, these two provisions need

---

**12.** Plaintiffs suggest that the court might be able to select a few individual years out of the time period under consideration in this case and grant partial summary judgment as to those years. Because the remainder of the case is going to trial, the court finds that "there is reason to believe that the better course would be to proceed to a full trial" with respect to all of the years. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. At least, prudence dictates this result.

not be addressed. What remain are Articles 3(h) and 9(a).

Article 3(h) provides that water delivery could be reduced contractually by mutual agreement of the contracting parties. Amicus raises the possibility that the New Melones Interim Plan of Operation, to which the parties allegedly agreed in 1997, may be such a mutual agreement. Amicus Br. filed Jan. 3, 2006, at 9. The circumstances surrounding this agreement must be developed fully at trial.

Perhaps more important is defendant's allegation that the Government's liability is excused under Article 9(a) because the CVPIA, passed by Congress, was a circumstance "beyond the control of the United States." Again, Article 9(a) provides, in pertinent part:

> [T]he United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall [accrue] against the United States . . . .

Stockton East Contract art. 9(a). Plaintiffs argue that this language is, in effect, an "act of God" provision that only excuses performance in drought, flood, terrorist attack, or similar disaster. Defendant reads this provision as comprehensive in that it contemplated any unexpected occurrence, including, but not limited to, drought. Thus, the passage of the CVPIA would qualify as such a circumstance beyond the Government's control. Defendant and amicus also argue that the "all reasonable means" language, read in context, indicates that, as long as "the government has used 'reasonable means' to avoid a shortage—but a shortage nonetheless has occurred—the government has discharged its contractual duty." Amicus Br. filed Jan. 3, 2006, at 8. Plaintiffs counter that Reclamation's duty to act reasonably was separate from the protection from liability in cases where events occurred beyond its control.

The court rules that this provision, even read in context, is ambiguous. A contract provision is ambiguous when it is "susceptible to more than one reasonable meaning." *Barron Bancshares*, 366 F.3d at 1375–76. It is possible to interpret the provision as requiring a disaster on the order of a drought, lightning, or other destructive element to excuse the Government's liability. The provision may also be read to allow for a wider array of possibilities. In fact, water rights are so contentious in the State of California that it is not at all unreasonable that the parties might have contemplated changes in the controlling law or regulations to be circumstances beyond their control that might alter the contract.

In short, the parties' intentions are unclear, and the language is susceptible to at least two different, but reasonable, readings. In such a situation, extrinsic evidence may be considered to clarify the intentions of the parties. *See Sylvania Elec. Prod.*, 458 F.2d at 1005. However, while the extrinsic evidence in this case is voluminous, it is not briefed adequately, but, for the most part, framed generally. Therefore, trial is required, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, to allow the parties the opportunity to develop a complete, and hopefully consistent, record on their intentions regarding the language in Article 9 of the contract.

### 5. *Discretion of the contracting officer under Articles 9 and 12*

Defendant and amicus argue that if the contracting officer decided, under Article 9(a), that the water shortages were "beyond the control of the United States," then, as per Article 12(d), plaintiffs may challenge that determination only if it is "predicated upon arbitrary, capricious, or unreasonable opinions or determinations." Stockton East Contract art. 12(d).

Plaintiffs respond that the contracting officer only issued a determination of shortage in 1994, which was a year of drought. Plaintiffs argue that they would lose their Article 12(d) right to appeal to the Secretary of the Interior without official factual determinations by the contracting officer.

Article 9(a) does appear to give discretion to the contracting officer to determine what

is a "shortage ... beyond the control of the United States." *Id.* art. 9(a). Article 12(d) goes on to state that these "opinions or determinations ... shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations." *Id.* art. 12(d). Therefore, the contracting officer's determinations under Article 9(a) can be binding on the parties under the terms of Article 9(a), provided they are not arbitrary, capricious, or unreasonable under the terms of Article 12(d). Any of these determinations, if they were "factual," would then be appealable to the Secretary.

This deficiency in drafting leaves two questions. First, the contract is ambiguous as to what sort of "opinions and determinations" were necessary under the contracts. Plaintiffs believe a formal declaration, such as they received in 1994, was necessary. Although such a requirement is not set forth explicitly in the contract, it might be implicit in the phrase and, indeed, makes some sense in order to have a written record of the factual determination for the appeal to the Secretary. Nonetheless, the evidence regarding what sort of "opinions and determinations" was required to be issued by the contracting officer, as well as what decisions he actually issued, has not been developed sufficiently enough to sustain a finding. Second, assuming that the contracting officer issued the necessary determinations, it remains to be determined if they were arbitrary, capricious, or unreasonable under the circumstances. Trial will allow the parties to expand upon the evidence bearing on both of these questions.

### 6. *Adjustments as the sole available measure of damages*

Even if defendant is liable for breach, defendant and amicus argue that plaintiffs' sole remedy is for a "refund of amounts previously paid or credits against future water deliveries." Amicus Curiae Br. filed Jan. 3, 2006, at 21. Article 6 of the contracts provides:

> The amount of any overpayment by the Contractor due to the quantity of water actually available for the Contractor during any year ... having been less than the quantity for which the Contractor was required to pay shall be applied first to any accrued indebtedness then due and payable by the Contractor pursuant to this contract. Any amount of such overpayment then remaining shall ... be refunded to the Contractor .... Such adjustments shall constitute the sole remedy of the Contractor ....

*Id.* art. 6.

Concentrating on the language that "[s]uch adjustments shall constitute the sole remedy of the Contractor," defendant argues that plaintiffs cannot recover money damages. Plaintiffs respond that this provision merely deals with remedies for overpayment, and the court agrees. Unlike most of the language in the two contracts, Article 6 is not ambiguous. Defendant is correct that the provision does not state specifically that the adjustments shall be the contractor's sole remedy for overpayments. However, when read in the context of Article 6, as a whole, it is obvious that was the intent. By its plain terms, Article 5 of the contracts required plaintiffs to pay in advance of receiving the water. Article 6, then, deals with what would occur if plaintiffs paid for water that they did not receive: Overpayment would be subtracted first from plaintiffs' debt, then "[a]ny amount of such overpayment ... remaining" would be "refunded to the Contractor" as the "sole remedy" available for the overpayment. *Id.* art. 6. It is also notable that Article 6 is titled "Adjustments," not a heading more portentous such as "Sole Remedies for Breach." In any event, the court finds as a matter of law that this provision is unambiguous in its purpose: the determination of the consequences of overpayment on water purchased, but not delivered. Its language does not support, and it seems unlikely that the parties intended, that it be construed as a sole remedy for breach. The court rules that it is not.

### 7. *Other arguments*

Other arguments put forth by plaintiffs and defendant were explored during oral argument. While the court has considered

these arguments, it has found them unpersuasive at the summary judgment stage.[13]

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's cross-motion for summary judgment is granted insofar as California Water Service Company, City of Stockton, and County of San Joaquin are not third-party beneficiaries to the contract with Central San Joaquin Water Conservation District and is otherwise denied. Plaintiffs' partial motion for summary judgment on liability is denied.

2. A scheduling order has been entered separately.

---

13. In particular, defendant and amicus press the argument that plaintiffs' water rights were limited by background principles of state law. The court does not rule on this argument. It may be addressed at trial and in the related briefing. The court does note, however, that the California case that amicus filed as supplementary authority is unpublished and cannot be cited under California rules, and plaintiffs correctly object to the citation on those grounds. Material of this nature submitted by amicus is unhelpful.